610 So.2d 308 (1992)
ILLINOIS CENTRAL RAILROAD COMPANY
v.
Jeffrey L. WHITE, Joyce J. Malone, John R. White, Hilarie Anne White Tuminello, and Deposit Guaranty National Bank, Executor of the Estate of Hilary L. White, Deceased.
No. 89-CA-0781.
Supreme Court of Mississippi.
August 26, 1992.
*309 Clifford K. Bailey, III, Wise Carter Child & Caraway, Jackson, for appellant.
Pat M. Barrett, Jr., Barrett Law Offices, Lexington, John S. Holmes, Holmes & Holmes, Yazoo City, Rebecca Lee Wiggs, Watkins & Eager, Jackson, Guthrie T. Abbott, University, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and McRAE, JJ.
DAN M. LEE, Presiding Justice, for the court:
This case comes to us from the Yazoo County Circuit Court presenting an appeal by the defendants below, Illinois Central Railroad, and a cross appeal prosecuted by the plaintiffs below, the beneficiaries of the estate of Hilary L. White.
On November 21, 1986, Mr. Hilary L. White, a Yazoo County farmer, was killed when he was struck by an Illinois Central train as he attempted to cross from one section of his farm to another. Mr. White's surviving widow[1] and children filed a wrongful death action[2] against the Illinois Central Railroad Company (railroad) and the train engineer in the Yazoo County Circuit Court alleging negligence by the railroad. The case proceeded to trial in the circuit court on November 21, 1988. Following a three day trial, the jury returned a verdict for the plaintiffs in the amount of $300,000.00 for actual damages; $15,000.00 for expenses to the estate; and $4,000,000.00 as punitive damages against the railroad.
Following the jury verdict, the railroad filed post trial motions for JNOV, New Trial, and Remittitur. The trial court entered an opinion wherein it denied the railroad post-judgment relief of JNOV, New Trial, and Remittitur as to liability. However, the lower court sustained the railroad's motion for JNOV for the judgment of punitive damages.
Now, the railroad brings this appeal alleging that the court below erred in denying the post-judgment relief on the issues of liability. Specifically, the railroad argues that Mississippi law imposes upon it no duty which it breached regarding the private farm railroad crossing where Mr. White was killed. Mr. White's children and estate bring a cross appeal alleging error in the trial court's entry of JNOV for the judgment of punitive damages.
*310 After a thorough review of the record, briefs, and the benefit of oral argument before this Court, we are convinced that no error was committed in the court below. Consequently, we affirm on both direct and cross appeal.

FACTS
On a clear day, November 21, 1986, at approximately 1:15 p.m., Hilary White was driving a D-6B Caterpillar bulldozer on his farm from one pasture to another where he planned to clear a fence row. Mr. Judge Cowan, a farm employee, had preceded Mr. White to this location and was serving as a lookout for the dozer as it approached this private farm crossing. As the blade of the dozer met the first rail, a train appeared in the curve south of the crossing. Mr. Cowan saw the train when it came into view, and he motioned for Mr. White to hurry on across the railroad track. Mr. White also saw the train. He throttled the dozer all the way over and attempted to jump. Tragically, Mr. White was too late. Mr. White made it to the running board just below the seat when the train hit the rear of the dozer on the winch. The impact spun the dozer around, and Mr. White was killed instantly. No serious injuries were suffered by the train crew of four men.
Mr. White was approximately sixty years old and in excellent health. He owned several hundred acres of land at this location which was about a mile southeast of Tinsley, Mississippi, near milepost 186. On the morning of the accident, the train crew left Jackson northbound for Yazoo City with two diesel freight engines and 16 freight cars. After arriving in Yazoo City, the train dropped all but one car, and the crew picked up six new freight cars and started back on the southbound run to Jackson. There were two public crossings in close proximity to the private farm crossing where Mr. White was killed. One public crossing was located approximately one mile south of Mr. White's crossing, and another public crossing was located at Tinsley, near milepost 185. The public crossing at Tinsley was one mile north of Mr. White's crossing. Both of the public crossings in close proximity have whistle boards which are small metal signs consisting of a black "W" on a white background. The sole purpose of the whistleboard is to remind the train engineers to blow the horn as they approach these crossings. There was no whistle board in place for the private farm crossing at milepost 186 where Mr. White's farm was located, and there has never been one there. When the train left Yazoo City and was southbound back to Jackson, it was travelling approximately thirty-five miles per hour. The train passed through Tinsley and the engineer sounded his horn for the public crossing located there. There are two curves between Tinsley and Mr. White's crossing. The first curve bears to the right and the second winds to the left. The track in this area is on a downhill grade, and Mr. White's crossing was located immediately south and east of the second curve in an area that has a sight distance of only about 550-650 feet from the top of the curve to the crossing.
Mr. Judge Cowan, who had worked for Mr. White for three years, testified that it was Mr. White's custom to post an observer across the track whenever he needed to pass over the rails with farm equipment. On the morning in question, Mr. White and Mr. Cowan serviced the bulldozer a short time earlier in an equipment shed about half a mile away. Mr. Cowan preceded Mr. White and crossed the track in a pickup truck and cut two trees with a chain saw. After Mr. Cowan had cut the second tree, he turned the saw off and heard Mr. White approaching with the bulldozer. Mr. Cowan walked about 20 feet back to the tracks where he posted himself as a lookout for Mr. White. Mr. Cowan testified that he heard no train horn until well after the train had come into view, and he stated that the train didn't slow down very much at all before striking Mr. White.
During certain times of the year the crossing would be used approximately four or five times daily, and it was very common to have to wait on the train to pass whenever he tried to cross the track with farm equipment. Mr. Cowan testified that before Mr. White reached the track and was *311 half a dozer's length away, Mr. White looked up and down the track, but the train was not yet in view.
The train engineer, E.R. Walker, testified that upon seeing Mr. White on the track, he immediately put the train into emergency operation, which included sounding the horn and applying the brakes. The undisputed testimony at trial was that because of the short distance between the curve and where Mr. White first came into view, the train brakes were successful in slowing the speed only five miles or less (35 to perhaps 30 miles per hour). Mr. Walker testified that he had never blown his whistle for the crossing at Mr. White's farm. He stated that if he sees someone at a private crossing where he is approaching, then he will blow the horn. Otherwise, the horn is not blown at private crossings.
The train derailed at the point of impact and straddled the left rail. The train came to rest 900 feet beyond the point of impact. The last car went past a trestle bridge which spanned a 32-foot-deep ravine just south of the crossing. Therefore, in order to visualize the track area where the collision occurred, it is important to remember that the private farm crossing where Mr. White was killed is approximately 550-650 feet south of a curve; and, just south of the crossing there is a railroad trestle where the tracks are suspended over a ravine. Hence, the plaintiffs presented evidence at trial that due to the curve north of the crossing and the wooden trestle to the south, this particular farm crossing is "extra hazardous."
Mr. George Clifton, a 65 year old resident of the Tinsley area, testified that the crossing where Mr. White was killed has been in existence, "since I can remember." Mr. Clifton would occasionally do farm work for Mr. White, and he had worked for other farmers who previously owned the property. According to Mr. Clifton, the railroad company kept the crossing maintained for as long as he could remember.
Mr. James Walton owned the property before selling it to Mr. White. According to Mr. Walton, he farmed this land from 1973 until 1981 or 1982. Mr. Walton used the crossing with pickups, tractors, combines, trailers and bulldozers. During the summer months when Mr. Walton was cutting hay, he would use the crossing four or five times daily, and in the winter he would typically use the crossing once or twice daily. Mr. Walton testified that sometime during his ownership of the land, the railroad improved the crossing by replacing wood timbers with gray fill gravel. According to Mr. Walton, trains would sometimes blow the whistle before coming into the curve at the crossing where Mr. White was killed. "At times they did and at times they didn't." Mr. John Walton, James Walton's brother and farming partner, testified to the same fact. According to John Walton, he would hear one blow of the horn at Tinsley at the public crossing, and then he would hear a second blowing of the horn in the curve before the farm crossing. According to John Walton, "I don't think they always blew the horn, but they blew it several times that I can remember." John Walton testified that the railroad maintained the crossing in good shape at all times. He also stated that when he had to cross the railroad track with a piece of slow-moving equipment, he would always post someone as a lookout so that he would know when it was safe to pass.
However, Archie Davis, another farm employee of Mr. White's, testified that the train was not in the habit of blowing its horn before coming around the curve at the crossing. According to Mr. Davis, there would always be two people together whenever they would cross the tracks. A lead vehicle would cross and then wave over the second. In fact, Mr. Davis testified that Mr. White had instructed the farm employees to be careful at the crossing and to always have one person serve as a lookout to wave other vehicles across the rails.
Ken Sheffield, an environmental consultant with Environmental Protection Services in Jackson, Mississippi, visited the site of the accident. With the help of Judge Cowan he conducted a sound test using a bulldozer of the same make and model as that which Mr. White had. Mr. Sheffield waited for a train to come through, and he *312 measured the sound level of the dozer and the train's horn. The sum and substance of Sheffield's testimony was that with the dozer running he could clearly hear the train's whistle when it came through on the day he conducted the test. Thus, assuming same or similar conditions existed on the day when Mr. White was killed, Mr. White would have easily heard the train whistle if it had been blown before entering the curve.
Dr. Gary Long, a university professor and transportation engineer at the University of Florida, was certified as an expert in transportation engineering. Dr. Long formed his opinion from viewing the exhibits and from conducting an on site inspection of the crossing and track area where Mr. White was killed. Dr. Long's opinion of the railroad crossing was that it was an "extra-hazardous crossing." Dr. Long explained his opinion of why this crossing was extra hazardous:
There's several factors which are involved with that. The primary factor being that the  that there's inadequate sight distance. The curve in the track and the vegetation allow someone trying to cross the crossing only to see a short distance down the track, and, therefore, not really be able to see a train in threatening proximity. There's a trestle there that's very close to the crossing which goes over a rather deep ravine, and in the event of a collision, that would possibly cause the railroad  the train to go off that  off that trestle. And, so, it's a location where there's a certain danger to the train crew.
The train travels at a rather high rate of speed for such short sight distance, and that means that by the time the train crew is to a point where they can see somebody at the crossing it's too late for them to take any action to do anything to try to avoid a collision. Moreover, they don't have a warning  they don't have adequate sight distance in order to be able to sound the horn to warn somebody that might be at the crossing before it's too late to be able to take action or not cross the crossing because of the proximity of that train.
According to Dr. Long, the railroad should have posted a whistle board in advance of the crossing so that anyone at the crossing would have adequate time to cross or refrain when a train is in threatening proximity.
The plaintiffs also presented the testimony of Henry E. Buck, Jr., a former engineer with Illinois Central Railroad. Mr. Buck conducted an on-the-site inspection of the crossing where Mr. White was killed. Based on his expertise and experience as a railroad locomotive engineer and his personal inspection of the crossing, Mr. Buck testified that the crossing was extra dangerous due to the close presence of the curve and the trestle just south of the crossing.
When you get to the curve, it's about 500 feet from the point that you can see the crossing to the crossing, which really doesn't give you enough time to stop your train. And the trestle is about four or 500 feet further south of the crossing.
According to Mr. Buck, the railroad should have placed a whistle board before the curve to warn anyone who might be using the crossing that a train was approaching. Mr. Buck also stated that the engineer should have blown the horn even though a whistle board was not present.
The plaintiffs called Richard Barnhill as an adverse witness. Mr. Barnhill has been an employee of Illinois Central Railroad Company for 19 years, and he was on the train that hit Mr. White serving as a flag-man. On the day in question, Mr. Barnhill testified that he blew the train's horn at the Tinsley public crossing because there was a whistle board instructing him to sound the horn, but he did not blow the horn prior to Mr. White's farm crossing. According to Mr. Barnhill, the railroad's policy was not to blow the horn at private crossings unless the railroad had notification that there would be activity at a particular location. Mr. Barnhill testified that prior to the day when Mr. White was killed, he had never seen anyone at the crossing.
Richard Jordan, the train brakeman, has been employed with the railroad since 1969. *313 According to Mr. Jordan, he had been on this track and over this particular crossing hundreds of times in the past, and he was unaware that there was even a crossing there. He testified that he had never seen any activity at this location in the past. Mr. Jordan did testify, however, that there were very few private crossings like the one at Mr. White's farm because it was close to a curve and surrounded by heavy vegetation.
Neil Thrash, a track supervisor for Illinois Central Railroad, testified that he had been over the track at Mr. White's crossing approximately 1200 times in the past twelve years. During that length of time, Thrash testified that he had never seen anyone at the crossing. On one occasion, Mr. Thrash saw a tractor parked in one of the adjoining fields. Other than that one occasion, Thrash had never seen any activity in and around the crossing.
Mr. John Williams, the train conductor, testified that he had been travelling on this particular line since 1972, and he had never seen anyone around milepost 186. Williams' testimony was that he was not even aware that there was a crossing there. "I never even had no imagination that that was a crossing."
Dean Hopson, track supervisor, explained that the Yazoo District extended approximately 72 miles from Tchula to Jackson. According to Mr. Hopson, approximately 12 to 15 trains are on the tracks in the Yazoo District on a daily basis. All of these trains pass over the crossing where Mr. White was killed. Mr. Hopson testified that he travels this rail approximately once a week. Hopson testified that whistle board signs are normally installed approximately 900 feet on each side of public crossings. According to Hopson, if a private crossing is regularly used, then the railroad may consider placing a whistle board at such locations. According to Mr. Hopson, Illinois Central had erected approximately ten whistle boards at private crossings in the Canton, Grenada and Yazoo Districts. Hopson also testified that in the Yazoo District there were very few private crossings where the view would be obscured with an approaching curve. According to Hopson, most private crossings in the Yazoo District are in a wide open area where visibility is not a problem. Hopson testified that in the last 20 years, he could only recall four or five times when he had seen some activity in the fields at Mr. White's farm. Mr. Hopson stated that he had never seen anyone pass over the crossing. According to Hopson, when the railroad has advance notice that someone wants to cross the track with heavy equipment, the railroad notifies the crew to expect some activity at the crossing. According to Hopson, on some occasions the railroad even tries to post flag men to protect the crossing that is going to be used for heavy equipment. For instance, the telephone company would work alongside the track from time to time. However, when pressed on cross-examination, Hopson acknowledged that in his entire work experience, he had never received advance notice by a farmer who desired to pull a piece of equipment across the tracks.
According to William J. Burns, safety engineer for Illinois Central Railroad, whenever a large piece of equipment crosses the track, permission is required from the railroad. "If you were going to cross the railroad property with a dozer or a drag line or large piece of equipment, you have to have permission to cross the railroad. We have it all the time up and down the road." Mr. Burns acknowledged, however, that he had never conducted an education program to notify farmers who own property along the railroad that they should obtain permission before attempting to cross the tracks with a piece of large equipment. Mr. Burns stated that he didn't know how a farmer was to know that permission from the railroad is required before attempting to cross the railroad tracks with farm equipment. According to Burns, if the farmer did not happen to be a part of the Civitan Club, Rotary Club or part of a school program, he would have not gotten the message that permission was required. Mr. Burns stated that when the railroad receives notification that an individual wants to cross the track with heavy equipment, the railroad notifies the *314 train to slow down and be prepared to stop, if necessary.
For the railroad's case-in-chief it presented Terry Hart, a train master for Illinois Central Railroad. Mr. Hart testified that when the railroad is notified of someone's intention to cross the tracks with heavy equipment, the railroad's practice is to issue instructions to the train crew in writing via a computer message. The instructions to the crew are to approach the area prepared to stop. Mr. Hart testified that on the day in question, November 21, 1986, he received no such message from Mr. White. Hart stated that he presented talks to civic organizations informing them of the need to notify the railroad in advance of an anticipated crossing. On two occasions, Hart had gone to farmers' auctions and presented a program to the farmers to make them aware of railroad crossing safety. Mr. Hart acknowledged, however, that he was unaware of any effort by the railroad to target farmers who own property along the tracks to inform them of state law[3] which requires notice to the railroad before crossing with heavy equipment.

I.

The trial court erred in not granting the railroad's motion for directed verdict and judgment notwithstanding the verdict.
The decision to grant a directed verdict or judgment notwithstanding the verdict is one of law. When a motion for directed verdict or j.n.o.v. is made, the court must consider all of the evidence in the light most favorable to the nonmoving party (plaintiffs). Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 157 (Miss. 1989); Upton v. Magnolia Elec. Power Ass'n, 511 So.2d 939, 942 (Miss. 1987); McGaugh v. Gray, 495 So.2d 1024, 1025 (Miss. 1986); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985). In considering the evidence and all reasonable inferences, the court must determine whether the evidence is so overwhelmingly against plaintiffs that no reasonable juror could have found in their favor. Wall v. Swilley, 562 So.2d 1252, 1256 (Miss. 1990); Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 157 (Miss. 1898); Brewer v. Williams, 542 So.2d 1186, 1187 (Miss. 1989); Hall v. Mississippi Chemical Express Inc., 528 So.2d 796, 798 (Miss. 1988); Rester v. Morrow, 491 So.2d 204, 211 (Miss. 1986).
A directed verdict pursuant to M.R.C.P. 50(a) is not an appropriate means for the disposition of a case so long as questions of fact are raised in the proof at trial. Bank of Shaw v. Posey, 573 So.2d 1355, 1361 (Miss. 1990). It is fundamental in our jurisprudence that questions of fact are for a jury; questions of law are for the court. Cantrell v. Lusk, 113 Miss. 137, 143, 73 So. 885, 886 (1916).
The railroad wages a strong argument that Hilary White was negligent per se, and Mr. White's negligence was the sole proximate cause of the accident which resulted in his death. The railroad points to section 63-3-1013 as the basis for Mr. White's negligence in the operation of his bulldozer in a manner which resulted in his death. Section 63-3-1013 provides as follows:
No person shall operate or move any Caterpillar tractor, steam shovel, derrick, roller, or any equipment or structure having a normal operating speed of six or less miles per hour or a vertical body or low clearance of less than nine inches above the level surface of a roadway upon or across any tracks at a railroad grade crossing without notice of any such intended crossing first being given to a superintendent of such railroad and a reasonable time being given to such railroad to provide proper protection at such crossing.
Before making any such crossing the person operating or moving any such vehicle or equipment shall first stop the same not less than ten feet nor more than 50 feet from the nearest rail of such railway and while so stopped shall listen and look in both directions along such track for any approaching train and for *315 signals indicating the approach of the train, and shall not proceed until the crossing can be made safely.
No such crossing shall be made when warning is given by automatic signal or crossing gates or a flag man or otherwise of the immediate approach of a railroad train car.
Miss. Code Ann. § 63-3-1013 (1972).
The railroad argues that this section was designed to prevent the very type of accident which claimed Mr. White's life. The statute imposes a mandatory duty upon the operator of any type of equipment having an operating speed of six or less miles per hour to inform the railroad prior to making a crossing. It is undisputed that Mr. White never provided the railroad with any notice of his intended crossing. The jury was instructed, without objection, that White did not give the railroad advance notice that he intended to drive his bulldozer over the crossing, and the instruction informed the jury that White was negligent as a matter of law. The railroad steadfastly maintains that had they received notice of Mr. White's planned crossing, the train would have rounded the curve at a speed that would allow the train to stop, and the train would have blown its whistle several hundred feet in advance of the crossing. Mr. Cowan testified that Mr. White did look up and down the track before attempting to cross, even though he did not stop as required by the statute. The estate argues that Mr. White's speed was so slow as he approached the track that he was "essentially stopped." Additionally, the estate argues that, had Mr. White come to a complete stop between ten and 50 feet from the tracks, he would not have seen anything because White's view was obstructed due to the proximity of the curve. In other words, one has to be very close to the rails before a train can be seen. Furthermore, the estate argues that section 63-3-1013 must be considered in conjunction with section 77-9-249 which provides as follows:
(3) In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train in which action it may appear that the said driver may have violated any of the provisions hereof, the question of whether or not the said violation was the sole or approximate cause of the accident and injury shall be for the jury to determine. The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury; and the comparative negligence statutes and prima facie statute of this State shall apply in these cases as in other cases of negligence.
Miss. Code Ann. § 77-9-249(3) (1972).
We find that the jury was correctly instructed as to Mr. White's duty to notify the railroad in advance, as well as his duty to stop, look and listen for a train before crossing the track. Section 77-9-249 provides that a statutory violation in and of itself will not defeat recovery, and the question of negligence shall be left to the jury, along with the appropriate comparative negligence principles which would be applicable in such cases. Upon examination of the record, we note that jury instructions 5, 13, 15, 16 and 17 all address Mr. White's duty of care and breach thereof under the correct comparative negligence standards employed in this state.
The railroad hangs most of its argument on the fact that the crossing at milepost 186 was a private right-of-way crossing to which the railroad owed no statutory or common-law duty to blow the train's whistle in advance. It is undisputed that the railroad crossing where Mr. White was killed was, in fact, a private crossing. The railroad track divided two parcels of land which Mr. White owned, and his only way of ingress and egress from the property was by passage over the tracks. The railroad points out that none of the Illinois Central employees who had been travelling over the crossing for years prior to the accident had ever seen anyone on the tracks at this site. In fact, two of the railroad employees testified that they were not aware that there was a private crossing at this location. In Mississippi, there is a statutory duty for a railroad to blow its horn or whistle at a distance of at least 300 *316 yards from the place where the railroad crosses over any public highway or municipal street and to keep the bell ringing continuously until the crossing is passed. Miss. Code Ann. § 77-9-225 (1972). However, there is no comparable statutory duty for private crossings.
While the plaintiffs concede that there is no direct statutory duty owed to the decedent, they argue that section 77-9-253 provides an "indirect basis" for a common-law duty owed to Mr. White. Section 77-9-253 requires the railroad company to construct and maintain necessary stock-gaps and cattle guards where its track pass through enclosed land and to make and maintain suitable crossings over the track for necessary plantation roads. Miss. Code Ann. § 77-9-253 (1972). The plaintiffs appropriately cite this statute as providing an affirmative duty on the part of the railroad to properly maintain a railroad crossing at places where the railroad traverses farm property. The plaintiffs seize upon the language in this statute referring to "necessary plantation roads," and they argue that this Code section elevates the railroad crossing at milepost 186 from a mere private farm crossing to a "plantation crossing."
The railroad counters that the duties of a railroad in approaching a private crossing which is not a public highway or a municipal street have been defined by a number of cases, beginning in 1901 and continuing through 1981. In railroad cases throughout the years, this Court has adhered consistently to the common-law distinctions between invitees, licensees, and trespassers as it has in other premises liability cases. In the past, Mississippi has adhered to the rule that a person using a private crossing which is not known to be regularly and frequently used by the public, is a licensee. Illinois Central Gulf Railroad v. Burns, 396 So.2d 637, 640 (Miss. 1981); Illinois Cent. R. v. Arnola, 78 Miss. 787, 788, 29 So. 768, 768 (1901). To this licensee, the railroad owes this person a duty not to willfully or wantonly injure and to exercise reasonable care for his safety after his presence is discovered. It has no duty to anticipate his presence, and the railroad has no duty to give an audible warning of its approach to a private crossing which is not known by the railroad to be regularly used by the public. The most recent railroad case to cling to this rule is Illinois Central Gulf Railroad v. Burns, 396 So.2d 637 (Miss. 1981). The Burns case involved an automobile which was hit by a train as it attempted to cross a private railroad crossing. Here, as in the case at bar, the railroad transected private property. In this 1981 opinion by Presiding Justice Robertson, this Court strictly followed the common-law categories of invitees, licensees, and trespassers. Significantly, this Court noted that the accident occurred at a private railroad crossing and that the injured, Mr. Burns, had not received permission from the landowner to be on the property. Consequently, this Court concluded that Burns was a trespasser and that the duty owed was one not to willfully or wantonly injure. Burns, 396 So.2d at 640. However, Justice Roy Noble Lee wrote a special concurrence in Burns which is particularly illustrative for the facts at bar:
I specially concur with the majority opinion and make additional comments on the case. The accident occurred at a little-used private crossing which provided access to the Stegall land upon which Mr. Burns and his sons were about to enter. The land was not posted and in my opinion, the Burns were licensees, not trespassers. The duty owed to a licensee and trespasser is the same, i.e., not to willfully or wantonly injure him. However, this rule is not so strict and is modified when applied to persons passing over private crossings. In that event, the train engineer must use reasonable diligence to detect a vehicle upon the tracks and when such is detected, he must use reasonable care to stop and avoid an accident. Alabama Great Southern R.R. Company v. Martin, 205 Miss. 851, 863, 39 So.2d 501 (1949).
At private crossings which people habitually traverse, a railroad company's duty to give signals and maintain the crossing is relative to circumstances existing at *317 the particular time. Thus, peculiar or extraordinary circumstances might differentiate such crossings from other private crossings, accordingly impacting on the railroad company's duty. Yazoo & M.V.R. Co. v. Wade, 162 Miss. 699, 139 So. 403 (1952).
Illinois Central Railroad v. Burns, 396 So.2d 637, 640-41 (Miss. 1981) (emphasis added) (Justice Roy Noble Lee's special concurrence).
Justice Lee's special concurrence is particularly cogent. The sum and substance of the special concurrence is that the railroad's duty does not always depend upon the rigid common-law classifications of the injured. Peculiar or extraordinary circumstances might exist at some frequently used private crossings which would differentiate them from other private crossings. Justice Lee noted that a private crossing which receives frequent use imposes upon the railroad a duty similar to that at a public crossing. Burns, 396 So.2d at 641. In discussing the duty owed by the railroad at a private crossing, Justice Lee quoted from and relied upon Illinois Central Railroad Company v. Dillon, 111 Miss. 520, 71 So. 809 (1916). Dillon instructs that the duty owed by the railroad is to be considered in conjunction with all the facts and circumstances relating to the use of the particular crossing at issue.
In considering what duty was owed by the appellant to the deceased in this case, it is necessary to view the facts and circumstances relating to the use of this crossing or footpath by pedestrians over the track.
Illinois Central Railroad v. Dillon, 111 Miss. 520, 523, 71 So. 809, 811 (1916).
Notwithstanding the fact that there was no "public" use of the crossing where Mr. White was killed, the plaintiffs are quick to add that, due to the extra hazardous location of the crossing, the railroad was under a duty of reasonable care which would have included a warning whistle by the train several hundred feet prior to the train entering the curve. To support this contention, the plaintiffs point to the following factors. First, the sight distance to the crossing was only approximately 550-650 feet due to the proximity of the curve in the tracks; and, a trestle over a deep ravine was only a short distance south of the crossing. Furthermore, the crossing is located in an area of heavy vegetation which also restricts visibility.
Dean Hopson, track supervisor, testified that very few private crossings in the Yazoo District were located in an area where the view would be obscured by an approaching curve. According to Hopson, most private crossings in the Yazoo District are located in open areas where visibility is not restricted. Therefore, the crossing at Mr. White's farm was somewhat unique in this regard. As noted in the facts, both Dr. Long and Mr. Buck testified that Mr. White's crossing was "extra-hazardous" due to the conditions stated above. Dr. Long testified that, by the time the train crew reached a point where they could see someone at the crossing, it was too late for the crew to take any action to try to avoid a collision. This was substantiated by the crewmen who testified at trial. The crewmen testified that the train did not slow down very much, if at all, from the time the bulldozer was discovered and the collision.
There was testimony that the track was used by the railroad for some 12 to 15 trains per day. During peak seasonal months Mr. White would use the crossing four or five times daily. Consequently, there existed several occasions when the railroad would likely encounter vehicles at Mr. White's farm, despite the testimony by railroad employees which suggested otherwise.
Truly, the evidence supports plaintiffs' assertion that the crossing was "extra-hazardous." In New Orleans and Northeastern R.R. v. Lewis, this Court spoke to the duty of care expected of a railroad company when trains approach dangerous conditions on the rails.
The general rule relating to the degree of care required of a railroad company to avoid collisions with travellers on the highway, where a dangerous condition has been created by the obstruction of *318 the view of the traveller on the highway, is stated in 44 Am.Jur.P. 747, Railroads, Par. 507, as follows:
The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions, as particularly applicable where the dangerous condition results from obstructions to the view which prevent a traveller from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution commensurate with the situation to avoid collisions with travellers on the highway, as by a less amount of speed, or by increased warnings, or otherwise, or, if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travellers, such as gates or other safety devices... .
New Orleans & Northeastern R. Co. v. Lewis, 214 Miss. 163, 172, 58 So.2d 486, 489 (1952).
In an Iowa case factually similar to the one at bar, a child was killed at a private farm crossing which the railroad was required to maintain. Ressler v. Wabash, 152 Iowa 449, 132 N.W. 827 (1911). The Iowa Supreme Court had to determine the duty owed to a private landowner at the crossing. That court struggled with the question but held that the landowner's family was entitled to a duty of reasonable care, and the key factor in so ruling was the farmer's equal right to use the crossing as that of the railroad's right to travel over the crossing.
The landowner does not hold his private crossing by the mere consent, license, or sufferance of the railway company. Nor is his right to its use dependent merely upon any invitation express or implied extended by the company. It is a right which is guaranteed to him by the statute. He has as much right to use his private way across the company's track as the company has to use its track across his private way, subject, of course, to the precedence which the heavy and rapidly moving trains of the railway may require when both parties approach the crossing at the same time. Thomas v. Railroad Co. (C.C.) 8 Fed. 729. If, then, both the railway company and the landowner may rightfully occupy and use the crossing for its designed purposes, it follows of necessity under familiar principles that each party must exercise that right with reasonable regard to the coexistent right of the other. What reasonable care requires of either in any given instance depends upon the circumstances which surround and characterize it.

Ressler v. Wabash R. Co., 152 Iowa 449, 132 N.W. 827, 828 (1911) (emphasis added).
The reasoning of the Iowa court is persuasive in light of Miss. Code Ann. § 77-9-253 (1972), which imposes an affirmative duty upon the railroad to maintain suitable crossings at necessary plantation roads. Furthermore, the Iowa case reflects the majority position adopted long ago by most jurisdictions:
The owner of a farm or his tenant in using a farm crossing constructed over his land by the railroad, either by contract between himself and the railroad, or by virtue of statute, for the purpose of reaching the farm or going from one part to another, etc., is ordinarily regarded as occupying a status superior to that of a trespasser or bare licensee; and accordingly, the railroad company owes the duty of exercising reasonable care to avoid injuring him while he is using the crossing.
Annotation, Duty of Railroad toward Persons Using Private Crossing or Commonly Used Footpath over or along Railroad Tracks, 167 A.L.R. 1253, 1294-95 (1947). See Baltimore & O.S.W.R. Co. v. Slaughter, 167 Ind. 330, 79 N.E. 186 (1906); Miller v. Seaboard Air Line R. Co., 94 S.C. 105, 77 S.E. 748 (1913); Terre Haute, I. & E. Traction Co. v. Ferrell, 95 Ind. App. 456, 164 N.E. 307 (1928); Atchison, T. & S.F.R. Co. v. Conlon, 9 Kan. App. 116, 57 P. 1063 (1899).
Considering the dangerousness of the crossing on Mr. White's farm and Mr. White's right to make reasonable use of *319 the crossing which the railroad, by law, is required to maintain, we find no error in the trial court's treatment of this case. Specifically, the duty of reasonable care which the lower court imposed upon the railroad was the correct standard of care, and whether or not the railroad breached that duty of care by its failure to install a whistleboard in advance of Mr. White's farm crossing was properly resolved by the jury. Hence, it follows that we find no merit to this assignment of error that the lower court erred in some manner by denying the railroad's motions for directed verdict and j.n.o.v.

II.

The trial court erred in refusing to grant ICRR's alternative motion for a new trial.
When a party makes a motion for a new trial, such motion should be granted only when the verdict is contrary to the substantial weight of the evidence. Burnham v. Tabb, 508 So.2d 1072, 1075 (Miss. 1987) (citing Baker Tools Inc. v. Buckley, 500 So.2d 970, 972 (Miss. 1986); Adams v. Green, 474 So.2d 577 (Miss. 1985)).
The discretion vested in a trial judge with regard to a motion for a new trial is broad. This Court's authority to disturb is limited to those cases wherein the trial judge has abused his discretion. Burnham v. Tabb, 508 So.2d 1072, 1075 (Miss. 1987) (citing Davis v. Singing River Elec. Power Ass'n, 501 So.2d 1128, 1129 (Miss. 1987); Shelton v. Puckett, 483 So.2d 354 (Miss. 1986)).
The railroad readily acknowledges that the jury was properly instructed on the comparative negligence statute in this state. Rather, the basis of the railroad's complaint is that the jury did not follow the law. "The jury's failure to comply with the court's comparative negligence instruction, alone, entitles ICRR to a new trial." Appellant's Brief at 36. Here, the railroad complains that the jury should have assigned more blame for the accident to Hilary White's failure to notify the railroad of his plans to cross the track as required by the statute. The railroad argues that the failure to assign more blame to White was manifestly unreasonable and against the great weight of the evidence. We disagree.
In this case, the jury was properly instructed as to Mr. White's comparative negligence. Jury instruction 13 informed the jury that if they found both White and the railroad negligent, and that the negligence of both parties contributed to the collision, then the jury must reduce any award that they would otherwise return for the plaintiffs for the actual damages by that proportion of negligence attributed to White. And, there were other instructions that the jury received pertaining to the duty that White was under in crossing the tracks. Furthermore, jury instruction 15 informed the jury that Mississippi law requires any person who desires to cross a railroad track with a Caterpillar to give advance notice to the railroad. Instruction 15 stated that White failed to give this notice and was negligent as a matter of law for such failure. Truly, the jury was correctly and fully instructed on Mr. White's negligence per se and comparative negligence principles.
The railroad also alleges that the trial court erred in allowing the expert testimony of Dr. Gary Long and Mr. Henry Buck. Mr. Buck and Dr. Long testified that the railroad crossing at milepost 186 was "extra hazardous," and their testimony outlined their reasons for this conclusion. By testifying that the railroad crossing was extra hazardous, the railroad argues on appeal that this testimony invaded the province of the jury.
In this case, the experts testified that the railroad crossing was extra hazardous (or dangerous) because of the proximity of the crossing to the curve and the trestle over the ravine. This is not the ultimate issue. The ultimate issue which the jury resolved was whether or not the railroad was negligent in not doing more to warn of its impending approach of trains at the White's crossing. The expert testimony that the crossing was "extra hazardous" merely assisted the trier of fact in this *320 regard. See Wilner v. Mississippi Export R.R. Co., 546 So.2d 678 (Miss. 1989); M.R.E. 704 (Opinion on Ultimate Issue).

CROSS-APPEAL

I.

Did the trial court err in granting the railroad's post-trial motion for judgment notwithstanding the verdict as to the issue of punitive damages?
The lower court entered a j.n.o.v. on the jury's verdict of $4,000,000.00 in punitive damages against the railroad. Under the facts of this case, the trial court concluded that the necessary elements of malice or gross negligence were simply not supported by the evidence.
In order to recover punitive damages under Mississippi law, there must be some element of aggression or some coloring of insult reflecting malice, gross negligence, or ruthless disregard for the rights of others. Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 150, 141 So.2d 226, 233 (1962). See Milner Hotels, Inc. v. Brent, 207 Miss. 892, 899, 43 So.2d 654, 655 (1949); Hadad v. Lockeby, 176 Miss. 660, 670, 169 So. 691, 693 (1936); Illinois Central R. Co. v. Ramsay, 157 Miss. 83, 87, 127 So. 725, 726 (1930). In the Court's opinion, the trial judge was completely justified in entering the j.n.o.v. as to punitive damages. Under the facts of this case, no reasonable juror could have concluded that the railroad's failure to blow the train whistle before approaching the crossing amounted to gross negligence, malice, or ruthless disregard for the rights of others. While the evidence supports the jury's verdict  that the railroad failed to exercise reasonable care  there is no evidentiary basis for punitive damages in this case. The railroad was negligent, at best, but certainly nothing more. Therefore, the circuit court properly granted the railroad's motion of j.n.o.v. as to the judgment of punitive damages.
In conclusion, we find that the trial court properly instructed the jury on the duty of care owed by the railroad to Mr. White. We also find that the jury received the correct instruction regarding the duty owed by Mr. White and the proper instruction of Mississippi comparative negligence principles. Likewise, we agree with the lower court that the facts of this case reveal none of the required elements to support a judgment for punitive damages. Consequently, we affirm on both direct and cross appeal.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
BANKS, J., not participating.
NOTES
[1] Mr. White's widow, Mrs. Ray G. White, died at some point following the trial in the case. Mr. and Mrs. White are survived by their children, who are the named parties pursuing a cross-appeal.
[2] Miss. Code Ann. § 11-7-13 (Supp. 1991).
[3] Miss. Code Ann. § 63-3-1013 (1972).