914 So.2d 738 (2005)
Lawrence ABRAMS, Appellant
v.
Larry BOGGS, Appellee.
No. 2004-CA-00470-COA.
Court of Appeals of Mississippi.
June 28, 2005.
Rehearing Denied September 13, 2005.
Certiorari Denied November 17, 2005.
*739 Stephan L. McDavid, Oxford, attorney for appellant.
James E. Price, Jr., Corinth, attorney for appellee.
Before KING, C.J., IRVING and GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶ 1. Lawrence Abrams filed this suit against Larry Boggs seeking to recover the principal and interest on a promissory note which Boggs executed in February 2001. Boggs maintains that he paid the note in full. The trial court granted a motion for directed verdict in favor of Boggs. Abrams appeals and argues that the trial court erred in granting the motion. We find the evidence presented at trial created questions of fact for the jury to decide and therefore reverse and remand.

FACTS
¶ 2. Abrams owned a building supply business in Corinth, Mississippi, named "Big Red Supply Company" (Big Red). In February 2001, Boggs and his business partner, Steve Wall, negotiated to purchase the business from Abrams. Abrams agreed to sell a 1/3 interest of the real property on which Big Red was located to each Boggs and Wall, with the option to buy the remaining 1/3 interest within a year. Boggs and Wall were each to pay $83,333.33 for their respective 1/3 interest.
¶ 3. In February 2001, Abrams signed a warranty deed reflecting the 1/3 interests of Boggs and Wall. Boggs and Wall each signed a promissory note to Abrams for $83,333.33. Boggs also signed a deed of trust on the real property to secure the promissory notes.
¶ 4. An agreement was reached with the understanding that payment of Boggs' and Wall's interests would be obtained through a loan from Southbank. However, Boggs and Wall could not obtain the loan with their credit histories. Thus, Boggs, Wall and Abrams obtained a loan from Southbank for $250,000 using Abrams' credit history. The bank issued two checks. The first check was for $166,000 and the second was for $74,000[1]. Boggs and Wall immediately endorsed the $166,000 check and delivered it to Abrams. The $74,000 check was endorsed by all three and deposited by Abrams into Big Red's business account. After these transactions were complete, Boggs and Wall began to work for the business.
¶ 5. In January 2003, Abrams sent a letter to both Boggs and Wall demanding payment on the promissory note within ten days from receipt of the demand. After no response was received, Abrams filed a lawsuit against Boggs and Wall. Subsequently, Wall filed for bankruptcy. Abrams pursued the lawsuit against Boggs.
¶ 6. A trial was held in the Circuit Court of Alcorn County. At the close of Abrams' case-in-chief, Boggs moved for a directed *740 verdict. The trial court found that Boggs had satisfied the debt owed to Abrams by signing over the $166,000 check and thus granted the motion for directed verdict in favor of Boggs. Abrams now appeals to this Court.

STANDARD OF REVIEW
¶ 7. On appeal, we conduct a de novo standard of review of motions for directed verdict. Munford, Inc. v. Fleming, 597 So.2d 1282, 1284 (Miss.1992). When deciding whether the granting of a motion for directed verdict was proper by the lower court, this Court considers the evidence in the light most favorable to the non-moving party and gives that party the benefit of all favorable inferences that may be reasonably drawn from the evidence presented at trial. Id. If the favorable inferences have been reasonably drawn in favor of the non-moving party so as to create a question of fact from which reasonable minds could differ, then the motion for directed verdict should not be granted and the matter should be given to the jury. Id.

ANALYSIS
¶ 8. Abrams contends that the trial court erred in granting Boggs' motion for directed verdict since the evidence presented at trial created questions of fact for the jury to decide. Abrams argues that the remaining $84,000 was his share. He claims that he has been paid for selling 2/3 of the property, but argues that the $84,000 deposited into the business account was actually a loan to Boggs and Wall for operating capital. Therefore, Abrams contends that Boggs and Wall must reimburse him the $84,000.
¶ 9. Boggs contends that he did not owe Abrams anything other than $83,333.33. He claims that he satisfied this debt for the 1/3 interest in the real property when he and Wall endorsed the $166,000 check and delivered it to Abrams. Boggs further contends that it was Abrams' decision to invest the $84,000 into Big Red and that he never considered this to be a business loan.
¶ 10. The dissent claims that Abrams, along with Boggs and Wall, is still obligated to repay the entire loan amount of $250,000 and since $166,000 was paid to Abrams, the remaining $84,000 belongs to all three parties. However, only two of the parties, Boggs and Wall, actually used the money. The $84,000 was placed in an account at Southbank. Boggs and Wall used this money to pay their salaries, pay their health insurance, and purchase supplies and inventory for the business. Additionally, Boggs maintained an office in the building. On the other hand, Abrams was not involved in the business. He did not receive a salary or write checks from the account. In short, Abrams received no financial benefit from the business. Because the remaining $84,000 was used solely by Boggs and Wall as operating capital, reasonable minds could differ as to whether the money was a business loan.
¶ 11. A directed verdict is not an appropriate means for disposition of a case so long as there are questions of fact raised by the evidence presented at trial. Illinois Cent. R.R. Co. v. White, 610 So.2d 308, 314 (Miss.1992). Questions of fact should be given to the jury. Id. In Claiborne v. Greer, 354 So.2d 1109, 1109 (Miss. 1978), Claiborne sued Greer for personal injuries she sustained in an automobile accident. At trial, both Claiborne and Greer presented two entirely different versions as to how the collision occurred. Id. at 1110-11. At the conclusion of all evidence, Greer moved for a directed verdict, which was granted by the trial court. Id. at 1111. On appeal, the supreme court reversed and found that the trial court *741 erred in granting Greer's motion for directed verdict since the conflicting evidence constituted a question of fact for the jury to decide. Id.
¶ 12. Here, like Claiborne, there is conflicting evidence and testimony. The promissory note did not state what the note was securing, a fact acknowledged by the dissent. Boggs argues that it was security for the purchase price of the business. Abrams argues that it was security for the operating capital. We find this to be a question of fact for the jury to decide. Thus, we reverse the trial court's decision to grant the motion for directed verdict and remand for further findings.
¶ 13. THE JUDGMENT OF THE CIRCUIT COURT OF ALCORN COUNTY GRANTING THE MOTION FOR DIRECTED VERDICT IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, BARNES AND ISHEE, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION.
CHANDLER, J., Dissenting.
¶ 14. I respectfully dissent and would affirm the lower court's grant of a directed verdict for Boggs. In my opinion, viewing the evidence in the light most favorable to Abrams, the jury could not have reasonably found that the promissory note secured Boggs's repayment of business operating expenses to Abrams.
¶ 15. The testimony and exhibits demonstrate that the material facts in this case are undisputed. In the latter part of 2001, Abrams acquired the sole ownership interest in Big Red Supply Company. He owned the land and business free and clear of any debt. Boggs and Wall were employees of Big Red Supply. Abrams, Boggs, and Wall agreed that Abrams would sell a two-thirds interest in the land to Boggs and Wall. Abrams was to keep the business. Boggs and Wall would decide at the end of the year whether they wanted to purchase the business and the remaining one-third interest in the land.
¶ 16. On February 9, 2001, Abrams, Boggs and Wall went to an attorney and executed several documents. They executed a warranty deed conveying a two-thirds undivided interest from Abrams to Boggs and Wall for ten dollars and other good and valuable consideration. Boggs and Wall each executed a promissory note for $83,333.33, one third of the value of the land, payable to Abrams upon demand. Then, Boggs executed a land deed of trust pledging the land as security for the promissory note. The warranty deed and deed of trust were recorded on February 12, 2001.
¶ 17. On February 15, 2001, Abrams, Boggs, and Wall obtained a loan from South Bank for $250,000. This amount represented the total value of the land. The three pledged the land as security for this loan with a deed of trust. South Bank issued two checks, one for $166,000 and one for $74,000, leaving $9,000 in loan proceeds in the possession of South Bank. The three executed an agreement subordinating South Bank's deed of trust to Abrams's deed of trust. The subordination of deed of trust was recorded on February 20, 2001.
¶ 18. Abrams testified that he took the $166,000 check and used it for personal expenses. It was undisputed that this $166,000 represented Abrams's payment from Boggs and Wall for their two-thirds interest in the land, the amount being equal to two-thirds of the land value, less $666.66. Boggs testified that Abrams told him that the $166,000 had discharged his *742 obligation under the promissory note. Abrams denied ever making this statement.
¶ 19. The $74,000 check was deposited into a new checking account for the use of the business. At this point, Abrams remained the sole owner of the business. Boggs and Wall managed the business and remained Abrams's employees. Abrams admitted that, since he owned the business, all profits from the business, if any, were his. The business used the above referenced $74,000, in part, to pay the salaries and benefits of Boggs and Wall. Later, the approximate remainder of the loan funds, $8,997.50, were drawn from South Bank and used for the business.
¶ 20. Abrams admits that Boggs and Wall paid him $166,000 for the land, but claims that neither Boggs nor Wall ever paid the $83,333.33 due under each of their promissory notes. Abrams claims it was the parties' understanding that the promissory notes executed by Boggs and Wall on the day of the land sale were promises to repay Abrams's investment of $83,000 into the business and were not promises to pay for their two-thirds interest in the land. Abrams testified that the reason both Boggs and Wall executed promissory notes in the amount of $83,333.33 was to create an arrangement whereby both Boggs and Wall would be severally responsible to Abrams for the $83,000 loan. But, the documents prepared by the attorney and signed by the parties do not reflect such an agreement.
¶ 21. A party's obligation to pay under a promissory note may be discharged "by an act or agreement with the party which would discharge an obligation to pay money under a simple contract." Miss.Code Ann. 75-3-601(1) (Rev.2002). Boggs claims that he paid the amount due under the promissory note by paying $166,000 to Abrams in exchange for the land, which represented $83,000 from Boggs and $83,000 from Wall, and equated to almost two-thirds of the value of the land. Boggs admitted that this payment left $333.33 due on each promissory note. There was undisputed evidence that, later, Boggs tendered $333.33 in full satisfaction of the promissory note, but it was refused.
¶ 22. "Rule 50 is a device for the court to enforce the rules of law by taking away from the jury cases in which the facts are sufficiently clear that the law requires a particular result." M.R.C.P. 50 cmt. In my opinion, viewing the facts in the light most favorable to Abrams, no reasonable jury could have found that the promissory note Boggs executed on February 9, 2001 was a promise to repay a $83,000 loan from Abrams to Boggs and Wall for business expenses rather than a promise to pay for the land.
¶ 23. The approximate $83,000 which Abrams claims he loaned to Boggs and Wall for business expenses came from the parties's loan for $250,000. Since all three parties borrowed the $250,000, the loan funds were the property of Abrams, Boggs, and Wall, who were obligated to repay those funds, with interest, to South Bank. It is undisputed that the parties agreed that $166,000 of the loan funds would be paid to Abrams in exchange for the two-thirds interest in the land and that Abrams used that amount for personal expenses. Yet, Abrams was still obligated, along with Boggs and Wall, to repay the entire loan amount of $250,000. This facts rendered the arrangement between Abrams, Boggs, and Wall exceedingly peculiar. But, once the $166,000 was paid to Abrams, the $83,000 that remained likewise belonged to the three parties.
¶ 24. Since the $250,000 loan funds and the obligation to repay South Bank belonged to Abrams, Boggs, and Wall, Abrams could not have loaned $83,000 of *743 the funds to Boggs and Wall. The $83,000 was already theirs and was not Abrams's to loan. Therefore, a reasonable jury could not have found that Abrams loaned Boggs and Wall $83,000 and that the promissory notes secured their repayment of that loan. The testimony of Abrams and Boggs was in agreement that Boggs and Wall had satisfied their obligation to Abrams for the land by allowing him to keep $166,000 of the loan proceeds for his own personal use. The $166,000 was approximately equal to the amounts due under the promissory notes executed by Boggs and Wall on the date of the land sale. It would unduly enrich Abrams to award him with an additional $83,000. For these reasons, I would affirm the decision of the circuit court directing a verdict in favor of Boggs.
NOTES
[1] Although the remaining $10,000 of the Southbank loan was not accounted for in the trial testimony, it apparently was deposited into the bank account of Big Red, giving a total of $84,000 deposited into the Big Red business account.