511 So.2d 939 (1987)
Elizabeth F. UPTON, Administratrix of Estate of Jeffery Leonard Faggard, Deceased,
v.
MAGNOLIA ELECTRIC POWER ASSOCIATION.
No. 57054.
Supreme Court of Mississippi.
August 19, 1987.
*940 Garland D. Upton, Columbia, for appellant.
J.W. Land, Bryan, Nelson, Allen Schroeder & Randolph, Hattiesburg, for appellee.
Before ROY NOBLE LEE, P.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This wrongful death action arises out of a fatal electrocution accident as a young high school graduate encountered a power line on his grandmother's property. Though the dead boy's mother has sued the power company, the evidence wholly failed to show that the lines or the electricity were owned by the power company or that it negligently did or failed to do anything that caused the fatal accident.
The trial court granted the power company's motion for a directed verdict. We affirm.

II.
Jeffery Leonard Faggard was born September 29, 1963. On Friday, May 29, 1981, he graduated from Tylertown High School. Five days later he was dead.
Jeff was living with his grandmother, Mrs. J.L. Bullock, in rural Walthall County, Mississippi. On Wednesday afternoon, June 3, 1981, Jeffery decided that he would electrify the fencing around the pen he had built for his deer dogs. He was working alone. At approximately 4:20 p.m. Jeff was found lying on the tin roof of a shed, adjacent to the dog pen, in the backyard. He was bare chested, with his body from the waist up hanging down between two wires that came to the front of the building. Jeff had been electrocuted.
Magnolia Electric Power Association (MEPA) supplied electricity to the Bullock home. The wiring bringing electrical current to the Bullock home is set forth in a configuration or schematic drawing attached hereto as Appendix A. In 1955 the wiring had been originally set up so that electricity was fed from MEPA's nearby transformer ("A") through a pole meter on a pole ("B") in the Bullock's back yard. From this pole meter, electricity was then fed to the Bullock home ("C"), a smoke-house in the back yard (Shed No. 1) and a brooder house (Shed No. 2) in the back yard, upon which Jeff was found dead.
Sometime between the initial installation of the pole meter and Jeff's accident, the meter had been removed and placed on the Bullock home. MEPA had not made this change. When the meter was moved, the wiring at the pole meter, which apparently had theretofore run through breakers in the meter base, was re-routed so that it did not pass through any breakers. This wiring had made it impossible to turn the electricity off going to the buildings in the back yard without turning the transformer off. The wires between which Jeff was found ran from a pole in the back of the smoke-house ("D"), which was fed by wiring from the pole ("B") upon which the meter had been originally installed. And, the rear of the building upon which Jeff was found was used as a support for chicken wire on the side of the dog pen next to the building. The chicken wire extended from the ground to just under and in contact with the flat tin roof of the building, making a ground. This means that the metal roof of the building would complete the grounding circuit if a "hot" wire came in contact with it, creating a very dangerous situation.
The transformer ("A") wire extending to the original meter pole ("B") belonged to MEPA. All of the remaining wiring, including *941 the wiring Jeff fatally encountered, belonged to the Bullocks and had been installed by the Bullocks.
In any event, on April 20, 1984, Jeff's mother, Elizabeth F. Upton, acting as administratrix of his estate, filed a wrongful death claim against MEPA in the Circuit Court of Marion County, Mississippi, alleging that MEPA had been negligent and seeking $5,000,000.00 in damages. Upton charged that Jeff's electrocution was the direct result of improper installation and connection of electric wires by MEPA which were connected directly to the wiring which Jeff came into contact with and caused his death.
In due course the case was transferred to the Circuit Court of Pike County, Mississippi, where trial was held on October 10, 1985.
At trial, Upton first called Hubert Wood, a service man for MEPA, who described the scene of the accident upon his arrival June 3, 1981. When Wood arrived that day, he found that the pole meter had long ago been disconnected and installed on the house, but the meter had been pulled off the house and placed on the ground. He described where the pole meter and meter base had once been located, and how the wiring had been changed so that the electricity to the buildings in the back yard could not be cut off with the breaker located in the meter base. Wood testified that MEPA had not moved the pole meter. Wood explained that the power company owned all the wiring up to the pole meter and that the power company owned the electricity until it passed through the customer's meter. He conceded that MEPA's meter reader reasonably should have noticed the (unauthorized) removal of the pole meter.
Elizabeth Upton then testified about an incident occurring February 11, 1976, which she later argues is indicative of MEPA's negligence. Specifically, she testified that her father and Jeff were pruning fruit trees and she was carrying the cut limbs to a pile to burn. She walked under the power lines that went to the building upon which Jeff was killed, and some of the limbs touched the wires and fire shot everywhere. The lights in their house went out, and they were unable to turn the electricity on by throwing the switches, so they called the power company. Two men from the power company came out, walked around and looked at all the wires and flipped something on the transformer located on a nearby pole and the lights came back on. She testified that was all the employees of the power company did. She later argues that the power company was negligent, via these employees, because they should have recognized a dangerous condition and remedied such condition at that point in time. Elizabeth also testified about Jeff's reason for being in the backyard that afternoon, and that he had no knowledge of electricity other than knowing how to trip the multi-breaker.
O.D. Martin, a neighbor of Mrs. J.L. Bullock, testified that on the afternoon of June 3, 1981, he went to the Bullock home pursuant to a call from Mrs. Bullock to come quickly. Upon his arrival, Martin saw Jeff lying on the tin roof looking as if he were already dead. Martin testified that in an attempt to cut the power off, he pulled the meter off the house power box and placed it on the ground. By this time, another neighbor, Buford Pigott, had arrived and together they cut the wires going to the building upon which Jeff was lying. Pigott also testified, substantiating Martin's testimony.
Upton's last witness was Robert E. Briggs, a consultant electrical engineer, was offered as an expert in electrical engineering. Upton's counsel posed Briggs a hypothetical question regarding whether the hookup to the Bullock home, with the pole meter removed and installed on the house, and with the wiring at the pole meter site route as it was the day of the accident, was a proper service connection. Briggs testified that in his opinion it was not. However, Briggs testified on cross-examination that, if the meter was on the pole and the wiring ran through the breakers in the meter base and the weatherhead[1] *942 atop the meter pole was the only hookup, then the service connection would be normal and proper.
Significantly, Briggs substantiated Wood's previous testimony pertaining to ownership and control of the wiring and electricity. Briggs testified that, typically, the power company owns wiring up to the weatherhead at the service point or, in other words, at the point of delivery, and that the power company owned the electricity until it passed through the customer's meter. Briggs also described safety requirements of the National Electrical Safety Code.
The Defendant's case-in-chief consisted of one witness, Evonne Martin, wife of O.D. Martin, who testified on behalf of Upton. Evonne testified that she followed her husband to the Bullock home on the evening of June 3, 1981, and upon arrival saw Jeff lying between two wires on the tin roof of the building in the back yard.
At the close of all the evidence, MEPA renewed its motion for a directed verdict. See Rule 50, Miss.R.Civ.P. The court asked Upton's attorney what specific act of negligence by the Defendant caused the death of the deceased. Upton's counsel responded that MEPA permitted electricity to flow through lines to the Bullock home, and the power company should have recognized a dangerous condition existed when it visited the Bullock home back in 1976. The Circuit Court sustained MEPA's motion for directed verdict, holding:
[T]he Plaintiff has to prove not only that the Defendant was negligent in some way, but that that negligence, if any, proximately caused or contributed to the injury producing the death of this young man. The evidence indicates that there was by somebody  I don't know who, but by somebody there was apparently an intentional shorting of the meter base by connecting the wires to the source lugs and that there was no meter in that meter base out at the pole. And then the power ran to the meter box at the house, where there was a meter. Now, the evidence  if that was negligence there has not been one iota of evidence introduced to show that that negligence, if any, caused or contributed to in any way the untimely death of Jeffrey Leonard Faggard. It's true that it was apparently electricity that caused his death, and it's true that electricity was supplied to the home by the Magnolia Electric Power Association, but their responsibility ends somewhere, and by law it ends once that power goes through the meter. It becomes the customer's electricity, and there is no way that I know of that any electric power association can prevent the users of their electricity from doing certain things that are extremely hazardous to their own health, such as, trying to rig up an electric fence while lying on a metal building. So I just don't feel that there has been sufficient evidence introduced upon which a judgment could be based by a reasonable jury and so, therefore, I'm going to sustain the motion of the Defendant, and will have to dismiss the case... .
On October 12, 1985, the Circuit Court entered final judgment dismissing Upton's complaint with prejudice. Upton now brings this appeal.

III.

A.
Upton's sole assignment of error challenges the correctness of the Circuit Court's granting of MEPA's motion for a directed verdict. Upton urges that the evidence was sufficient that a jury issue was created with respect to her charge that MEPA had been negligent and that such negligence had proximately caused her son's death. She argues, accordingly, that the Circuit Court should have overruled the motion for directed verdict and submitted the case to the jury.
When considering such an issue on appeal, we must keep in mind the standards the Circuit Court must employ. When the defendant moves for a directed verdict at the close of the plaintiff's case-in-chief, the circuit court must consider the evidence *943 before it at that time in the light most favorable to the plaintiff, giving the plaintiff the benefit of all favorable inferences that may reasonably be drawn from that evidence. See Dale v. Bridges, 507 So.2d 375, 377 (Miss. 1987); Jones v. Hatchett, 504 So.2d 198, 205 (Miss. 1987); Collins v. Ringwald & Godard, 502 So.2d 677, 678 n. 1-79 (Miss. 1987); Baker Service Tools, Inc. v. Buckley, 500 So.2d 970, 971-72 (Miss. 1986); Rucker, Stubbs Trucking v. Hopkins, 499 So.2d 766, 770 (Miss. 1986); Roosevelt Smith v. Estate of Louis Gilbert, 498 So.2d 823, 825 (Miss. 1986); White v. Hancock Bank, 477 So.2d 265, 268-69 (Miss. 1985); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
The same standard applies to motions for directed verdict or, as they were formerly called, requests for peremptory instructions, made at the close of all the evidence and to motions for judgments notwithstanding the verdict, except with these motions more evidence is before the jury at the time they are registered. Paymaster, 319 So.2d at 656; compare Goodwin v. Gulf Transport Co., 453 So.2d 1035, 1037 (Miss. 1984) (same standard applies to motion for directed verdict at close of plaintiff's case except the court only has evidence of plaintiff before it to consider at time motion is made). Indeed, as the Comment to Rule 50(a), Miss.R.Civ.P., explains, "[a] motion for directed verdict, pursuant to M.R.C.P. 50(a), supersedes both the former peremptory instruction practice and the demurrer to the evidence." Comments, Rule 50(a), Miss.R.Civ.P. Accordingly, when the defendant moves for a directed verdict at the close of all the evidence, the court must consider the plaintiff's evidence along with any uncontradicted evidence put on by the defendant, all in the light most favorable to the plaintiff. Baker Service Tools, Inc., 500 So.2d at 972; Paymaster Oil, 319 So.2d at 656; Comments, Rule 50(a), Miss.R.Civ.P. If the plaintiff's evidence and the uncontradicted evidence of the defendant, all considered in the light most favorable to the plaintiff, are such that reasonable jurors could differ as to the verdict, then a peremptory instruction (directed verdict) must be refused and a motion for j.n.o.v. denied. Baker Service Tools, Inc., 500 So.2d at 972.

B.
Electricity is a highly dangerous agency; therefore, the power company which dispenses and sells electricity is under a duty to use the highest degree of care for the protection of the public and individuals. Garcia v. Coast Electric Power Association, 493 So.2d 380, 382 (Miss. 1986) (cases collected therein). However,
As a general rule, there is no duty to inspect poles, wires or appliances before supplying electrical power where such poles, wires or appliances are controlled by the customer.
City of Starkville v. Harrison, 418 So.2d 51, 53 (Miss. 1982). Put another way,
[U]nless the current is supplied with actual knowledge of such conditions, the responsibility of the company supplying electricity ends when connection is properly made under proper conditions and it delivers the current in a manner that will protect both life and property.
City of Starkville, 418 So.2d at 52-53 (quoting 26 Am.Jur.2d, Electricity, Gas and Steam § 105 (1966)).
MEPA owed no duty to Jeffery Faggard with respect to electric lines not under its control. To be sure, Upton frames the issue as one of who had control over the electricity running through the wires as opposed to actual ownership of the wires. This is not the proper focus, as demonstrated by the duty set forth by this Court in City of Starkville, supra.
The only two witnesses (Wood and Briggs) qualified to testify about facts necessary to establish duty testified that MEPA owned all of the wiring up to the pole meter. The pole meter had been moved by someone other than MEPA between the time of its original installation and Jeff's accident. All wiring beyond the pole meter was under the control of the property owner, Bullock; therefore, MEPA's responsibility to inspect wiring stopped at the original pole meter connection. *944 See City of Starkville, 418 So.2d at 53. Further, electricity became that of the customers upon passing through the meter. As such, MEPA neither owned nor controlled the wiring between which Jeff was found lying or the electricity passing through such wiring.
Upton argues that MEPA owed Faggard an active duty to maintain its electrical wires, and "not merely a passive obligation to act only when some third person has gone to the trouble to volunteer information to the company of a particular danger at a particular place." Mississippi Power Co. v. Harrison, 247 Miss. 400, 152 So.2d 892 (1963). As such, Upton argues that when MEPA's employees came to the Bullock residence in February, 1976, a dangerous condition existed which MEPA's employees should have recognized and removed. The problem is that she never comes close to explaining how the problem that should have been apparent in 1976 would, if corrected, have eliminated the future cause of Jeff's death.
In the end, all of the talk about the meter amounts to so much rhetoric, for the fact that the meter was moved had nothing to do with the accident. The meter has no capacity to break the current going to the smokehouse or dog shed. Assuming, arguendo, that MEPA had knowledge that the meter had been moved to the house, and had an obligation to do something about it, Upton profits nothing, for had MEPA taken some action to get the meter placed back on the pole where it should have been, that, without more, would not have prevented the accident.[2] The danger, if any, as a result of the rewiring  we repeat, rewiring done by someone unrelated to MEPA and without its authorization or knowledge  was that there was no circuit breaker between the transformer and the wiring going to the smoke house and the dog shed. There is no testimony that the presence of the circuit breaker that originally was in place at the time the wiring was installed in 1955 would have prevented the accident.
We need to be real clear about this. Upton was charged in law with a duty to provide credible evidence that MEPA did something which we may label negligence and that such negligence proximately caused Jeff's death. Only two witnesses testified who could provide this sort of information, MEPA's serviceman, Herbert Wood, and electrical engineer, Robert Briggs. The most Wood would say was that the Bullock wiring done by Bullock on the Bullock property was unorthodox. He offered nothing helpful to Upton on causation. The most Briggs would say was that there was "an improper connection," that the wiring in question was "just not the proper way to run a service." He said further that the unorthodox wiring left at the old meter pole created "an unnecessary exposure." But one may search Briggs' testimony in vain for any suggestion that, had the wiring been done as he would have had it done, the accident could have been avoided.
Put otherwise, we find no occasion on which Briggs gives expert opinion testimony that any act or omission of MEPA proximately caused or contributed to the death of Jeffery Faggard. Indeed, the testimony of both Wood and Briggs appears to be that, had the breaker been in place and had the wiring carrying the current from the transformer to the dog shed gone through the breaker, Jeffery Faggard would still have been shocked when he encountered the wires while on the metal roof of the dog shed and nothing in that encounter would have tripped the breaker in time to save his life.
Considering all of the evidence under the legal principles set forth above, we find no error in the Circuit Court's order granting MEPA's motion for directed verdict.
AFFIRMED.
*945 WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ANDERSON and GRIFFIN, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] The weatherhead is a protective device located at the top of the meter pole.
[2] Inferentially, it appears that the power going to the pump house, the smokehouse and the dog shed, by reason of the removal of the meter to the side of the house, was not metered electricity. To the extent that Bullock used electricity at these three places, she received it free. Whether she or her late husband knowingly "stole" electricity from MEPA is a matter upon which we need not speculate.