949 So.2d 52 (2006)
McBRIDE CONSULTING SERVICE, LLC, Stuart McBride and Cindy K. McBride, Appellants
v.
WASTE MANAGEMENT OF MISSISSIPPI, INC. and Waste Management, Inc., Appellees.
No. 2003-CA-02805-COA.
Court of Appeals of Mississippi.
May 16, 2006.
Rehearing Denied November 14, 2006.
*53 J. Douglas Minor, J. Brad Pigott, Jackson, for Appellants.
Robert Eric Pfeffer, Fred L. Banks, E. Clifton Hodge, Luther T. Munford, James W. Shelson, Jackson, for Appellees.
Before KING, C.J., IRVING and BARNES, JJ.
KING, C.J., for the Court.
¶ 1. At the close of plaintiffs' case-in-chief, the trial court granted the motions of the defendants for a directed verdict. Aggrieved by this action, and the trial court's pretrial dismissal of the individual claims of Cindy McBride, the McBrides *54 have appealed and raised the following issues, which we state verbatim:
1. Liability for either of the "Intentional Interference" Torts turns entirely on the inherently factual issue of a defendant's intent to cause harm;
2. The Plaintiffs offered at trial substantial direct and circumstantial evidence that the Defendants authorized sales executive acted to "take away" the Plaintiffs' clients and to "go after" the Plaintiffs with "whatever it takes" and otherwise with an intent to cause the plaintiffs harm;
3. The trial court committed error by forbidding a jury from considering evidence of the intent of the defendants' executive toward the plaintiffs;
4. The trial court committed error in ruling that liability for intentional interference with contractual relations requires that the defendant's conduct caused a breach (as opposed to at will termination) of the plaintiff's contracts with a third party;
5. The trial court committed error in excluding testimony about a conversation between two Waste Management executives admitting that Waste Management's actions toward the McBrides had "A potential for blowing up on us" in court;
6. The trial court committed error in excluding testimony about the timing of David Myhan's profane statements about his intentions to "get" Stuart McBride and to "take his work no matter what I have to do";
7. The trial court committed error in granting partial summary judgement against Cindy McBride as to her individual claims.
Finding no error, we affirm.

FACTS
¶ 2. The McBrides had worked for many years in the waste disposal industry. In the mid-1990s, they used that experience to establish McBride Consulting Service, L.L.C. McBride Consulting is a waste broker. As a waste broker, McBride enters at will contracts with small businesses to serve as their exclusive agent for the negotiation of waste disposal contracts. McBride then negotiates with a third party waste disposal company a collective price for the waste disposal of its clients, and serves as paying agent for its clients. McBride makes its money from the cost savings obtained for its clients by this collective negotiation.
¶ 3. Waste Management is a third party waste disposer with whom McBride negotiated waste disposal for its clients. The collective price obtained from Waste Management by McBride was generally lower than which was then available to the individual businesses. However, because McBride did let its bids based upon volume, the cost to an individual client of McBride may or may not have been lessened.
¶ 4. McBride worked aggressively to grow its business. This included making contacts with businesses for whom Waste Management was already the contracted waste disposer. When McBride was employed to serve as the broker for a business, it gave the client a form letter to send to Waste Management. This letter directed that contract discussions be conducted through McBride, and also stated that where allowed, notice of the termination of the existing contract was being given. With the termination or expiration *55 of these contracts, McBride would put them out for bid.
¶ 5. Recognizing that waste brokers were a growing group, Waste Management adopted a national policy which required that (1) the rates to be charged to waste brokers be established by the regional office, (2) these rates be in upper tiers of the rate scales, and (3) the waste brokers sign a standard contract. The policy mandated that if a broker declined to execute the standard contract, then Waste Management would not do business with him. McBride refused to execute the standard contract, indicating that it routinely disposed of them without a through reading.
¶ 6. At some point in the process, Waste Management became concerned that its relationship with McBride was less than satisfactory. Among the concerns expressed by Waste Management were(1) the refusal of McBride to sign the standard contract and (2) its perception that McBride was tardy in the payment of the invoices sent to it. To address these concerns, Waste Management undertook a series of aggressive actions, including offering to individual businesses lower prices than those prices which it was willing to give to McBride. Waste Management made clear that these lower rates were only available to customers who dealt directly with it. As a result of the lower rates offered directly by Waste Management, a number of McBride's clients chose to contract directly with Waste Management rather than have their needs brokered by McBride.
¶ 7. McBride filed suit against Waste Management for (1) intentional interference with a contractual relations and (2) intentional interference with business relationships. At the conclusion of McBride's case-in-chief, the trial court, finding insufficient evidence to submit the matter to the jury, entered judgment for the defendants.
¶ 8. The trial court found that McBride had proven an interference with its business by Waste Management. However, it held that interference to have been privileged rather than tortious. The trial court found that the interference was at least in part motivated by business competition, and therefore McBride had failed to establish that it was done for an unlawful or improper reason.
¶ 9. Cindy McBride had also included a personal claim for emotional distress, which the trial court dismissed prior to trial. The trial court indicated that any claims which Cindy McBride had fell within the scope of the corporate claims and could not be pursued by her individually.

DISCUSSION OF THE ISSUES
Directed Verdict
¶ 10. This Court reviews de novo the granting of a directed verdict. In doing so, we consider the evidence in the light most favorable to the party against whom the directed verdict has been granted. Partain v. Sta-Home Health Agency of Jackson, Inc., 904 So.2d 1112, 1116(¶ 7) (Miss.Ct.App.2004). We may only sustain the granting of a directed verdict where the evidence as a matter of law is insufficient to establish even a prima facie right of recovery. Id.
¶ 11. Tortious interference with contract occurs when one causes another to breach a contract with a third person. Par Industries, Inc. v. Target Container Co., 708 So.2d 44, 48(¶ 8) (Miss.1998). Tortious interference with business relations, on the other hand, occurs when one unlawfully diverts prospective customers away from another's business. Id. at (¶ 10). With both torts, the plaintiff must prove (1) the offending acts were intentional *56 and willful, (2) the acts were calculated to cause damage to the plaintiffs in their lawful business, (3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice), and (4) actual damage and loss resulted. Scruggs, Millette, Bozeman & Dent, P.A. v. Merkel & Cocke, P.A., 910 So.2d 1093, 1098(¶ 23) (Miss. 2005); MBF Corp. v. Century Business Communications, Inc., 663 So.2d 595, 598 (Miss.1995). Additionally, in the case of tortious interference with business relations, in order to establish a prima facie case for damages, the plaintiff must prove (1) that his business experienced a loss, and (2) that the defendant was the cause of that loss. Par Industries, 708 So.2d 44 at 48(¶ 10).
¶ 12. Since a directed verdict is appropriate where an essential element of the plaintiff's cause is lacking, we will focus on whether Waste Management's actions were done with the unlawful purpose of causing damage and loss, without right or justifiable cause. The McBride evidence, if accepted by the finder of fact, established that the aggressive marketing by Waste Management offering substantially lower rates, including at or below cost, to prospective customers, had a direct financial impact upon the earnings potential of McBride. However, several Mississippi cases that discuss the closely intertwined torts have considered whether the defendant displayed "bad acts exceeding the realm of legitimate competition" and whether the defendant's acts were committed without legal or social justification. MBF Corp., 663 So.2d at 599; Par Industries, 708 So.2d at 48.
¶ 13. The aggressive marketing of a company's products or services, of necessity, is intended to impact the business of competitors by the increase in its market share and the decrease in the earnings potential of those others operating in the same sphere. Such actions in and of themselves are lawful, and without more, do not give rise to a cause of action.
¶ 14. The primary indication that Waste Management may have acted improperly is found in its documents, Exhibit 9, the Internet Price Model, which suggested that it was charging less to collect waste in some locations than its computer model indicated as the minimum cost of collection. The underpricing of goods or services is not unlawful, unless it has the effect of restraining free trade. Owens Corning v. R.J. Reynolds Tobacco Co., 868 So.2d 331, 344(¶ 32) (Miss.2004). There is no proof in the record that the actions of Waste Management had the effect of restraining trade. There were other waste disposal companies with whom McBride continued to contract. This fact is established in the testimony of Cindy McBride, who stated that in 2002 McBride lost seven customers to Waste Management, while moving over fifty customers from Waste Management to another waste hauler.
¶ 15. The evidence in the record indicates that Waste Management, having suffered the loss of a number of customers, aggressively marketed its services to its existing accounts, who had contracts with McBride. As a part of this aggressive marketing process, Waste Management offered these accounts rates substantially below those which they were able to receive by contracting with McBride to serve as their broker. In doing so, Waste Management made clear that these rates were only available under a direct contract, rather than brokered contracts. The results of this aggressive marketing is seen in the notation, "Took away from broker, but also needed to roll back price in order to keep," found on several Waste Management *57 documents related to customer accounts.
¶ 16. There was evidence presented from which it might be concluded that some contracts between McBride and its clients were terminated because Waste Management offered lower rates to these businesses. These were rates which Waste Management refused to extend to McBride. Waste Management says that its efforts were justified and legal because they were intended to keep its customers and increase its revenues. The effort to increase profitability, without more is not improper. However, the effort may be conducted under circumstances which render it improper, and therefore actionable. Cenac v. Murry, 609 So.2d 1257, 1269 (Miss.1992) (citing Wesley v. Native Lumber Co., 97 Miss. 814, 820, 53 So. 346, 347 (1910)). Likewise, the refusal of Waste Management to extend to a waste broker the same or lesser rates than those given to direct customers is not per se improper. Wertz v. Ingalls Shipbuilding, Inc., 790 So.2d 841, 848(¶ 27) (Miss.Ct.App.2000) (citing Restatement (Second) of Torts § 766 (1977)). Nor has McBride produced evidence of actions by Waste Management which were unlawful. Without proof of some improper action by Waste management, McBride's claim must fail.
¶ 17. The record before this Court indicates that both McBride and Waste Management were very aggressive in the pursuit of business, and may even be described as playing hardball. However, that is not illegal.
¶ 18. This Court finds that the directed verdict was appropriate under the facts of this case. Having found the directed verdict to be appropriate, this Court will not address the remaining issues.
¶ 19. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLANTS.
LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. GRIFFIS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.