# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00476-COA

**SILVER DOLLAR SALES, INC.**                                              **APPELLANT**

**v.**

**MICHAEL BATTAH**                                                        **APPELLEE**

DATE OF JUDGMENT:            05/02/2022
TRIAL JUDGE:                 HON. CELESTE EMBREY WILSON
COURT FROM WHICH APPEALED:   DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     GRADY F. TOLLISON JR.
                             TAYLOR HAMILTON WEBB
                             DANIEL HUDSON SPARKS
ATTORNEY FOR APPELLEE:       RICHARD D. UNDERWOOD
NATURE OF THE CASE:          CIVIL - TORTS-OTHER THAN PERSONAL
                             INJURY & PROPERTY DAMAGE
DISPOSITION:                 AFFIRMED - 01/23/2024
MOTION FOR REHEARING FILED:

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Randy Sparks owns Silver Dollar Sales Inc. (Silver Dollar), a Mississippi wholesaler that primarily buys and sells salvaged, out-of-date, discontinued, and other discounted groceries. Sparks also owns TBS Traders Inc. (TBS). TBS provided financing to River City Traders Inc. (River City), a Mississippi grocery wholesaler owned by Scott Olson. In January 2008, River City went out of business, defaulted on its debts to TBS, and caused Silver Dollar and TBS to incur substantial losses. TBS later assigned its claims against Olson and River City to Silver Dollar.

¶2. In 2010, Silver Dollar sued Olson for breach of contract, fraud, and other torts,

alleging that Olson was personally liable for River City's debts and other damages. The complaint also asserted claims against "John Does 1-10," alleging that unknown individuals or entities had conspired to maliciously interfere with Silver Dollar's business relationship with River City and Olson. In 2016, Silver Dollar amended its complaint to substitute Michael Battah for "John Doe 1." Battah is a Texan who is also in the wholesale grocery business. One entity that Battah owned, QQB Factors LLC (QQB), did business with River City for two or three months in late 2007, shortly before River City went out of business.

¶3. A jury trial was held in April 2022 in the DeSoto County Circuit Court. At the close of Silver Dollar's case-in-chief, the court granted Battah's motion for a directed verdict. The trial then proceeded to verdict, and the jury returned a verdict against Olson, finding that Olson had committed fraud and that Silver Dollar had sustained damages of $6,618,461.71. The jury also awarded Silver Dollar punitive damages in the amount of $250,000.[1] Olson did not file any post-trial motions or appeal. However, Silver Dollar filed a notice of appeal from the grant of a directed verdict and final judgment in favor of Battah.

¶4. On appeal, Silver Dollar argues that the circuit court erred (1) by granting Battah's motion for a directed verdict as to Silver Dollar's claim for tortious interference with business relations, (2) by sustaining a hearsay objection to an inventory that a nonparty consultant conducted at River City's warehouse, and (3) by "failing to control the courtroom" in response to objections by Battah's counsel. For the reasons explained below, the circuit

---

[1] The punitive award may have been reduced pursuant to the statutory cap on punitive damages. *See* Miss. Code Ann. § 11-1-65(3) (Rev. 2019). However, the final judgment against Olson is not part of the record on appeal.

court did not err by granting Battah's motion for a directed verdict because Silver Dollar presented insufficient evidence to support its claim against Battah. Therefore, we affirm the judgment of the circuit court. We do not address Silver Dollar's second and third issues because they do not affect our resolution of the first issue, which is dispositive.

## FACTS AND PROCEDURAL HISTORY

¶5. In the mid-1990s, Olson and two other men formed River City, a wholesale grocery supplier in DeSoto County. In September 1995, one of Sparks's companies, TBS, began providing financing to River City. TBS secured a line of credit from a bank, which River City could use to purchase grocery products for sale to retailers or other wholesalers. River City paid TBS a fee for the use of the funds.[2]

¶6. In 2001, River City declared bankruptcy. TBS was a large creditor of River City. To resolve TBS's claims and maintain the financing TBS provided, River City executed two promissory notes in favor of TBS, and the parties entered into a settlement agreement and a "Sales and Consignment Agreement" (Consignment Agreement). A promissory note for $1,320,000 required River City to make monthly payments of $7,500 plus interest for ten years, with the balance of the principal due after ten years. A promissory note for $512,397.03 required River City to make interest-only payments for ten years with the principal due after ten years. The parties' Consignment Agreement included the following terms:

- TBS would maintain a line of credit of at least $4,000,000 for River

---

[2] Another company Sparks owned had a similar financing relationship with Titan Wholesale Groceries, a competitor of River City.

City to buy inventory;[3]

- the inventory ("consigned products") would be the property of TBS until sold;

- all sales proceeds would be paid directly or remitted immediately to TBS;

- River City would receive compensation or a "commission" equal to the difference between gross sales proceeds and the cost of goods sold;

- River City would pay TBS a "charge" equal to three percent per annum of the average daily balance of the cost of inventory and accounts receivable;

- River City's borrowing under the line of credit would not exceed the combined balance of its inventory and accounts receivable by more than $60,000;

- River City would maintain accurate records of inventory and sales and provide such records to TBS upon request;

- River City would permit TBS or its representatives to inventory the consigned products at reasonable times.

¶7. Under the Consignment Agreement, River City primarily utilized TBS's credit to buy groceries wholesale from unaffiliated third parties. However, River City purchased approximately twenty percent of its inventory from Silver Dollar. On those purchases, Silver Dollar would earn a profit, and TBS would earn a three percent charge or fee under the Consignment Agreement.

¶8. By 2004, Olson was River City's sole owner.[4] In February 2006, unbeknownst to

---

[3] In 2006, the line of credit was increased to $4,500,000. Olson personally guaranteed the line of credit.

[4] One of River City's co-owners passed away around 2001, and the other left the business in 2003 or 2004.

TBS, River City began receiving payments directly from Albertsons, a grocery store chain, and failed to remit those payments to TBS. Between February 2006 and November 2007, River City received and retained payments from Albertsons totaling approximately $1,166,633.14. Under the Consignment Agreement, those payments should have been paid directly or remitted to TBS. During discovery in this case, Sparks determined that River City had received an additional $686,854.62 in payments from other customers that should have been paid directly or remitted to TBS.

¶9.     At some point in 2006, River City missed "a couple of" payments to TBS under the promissory notes but later "caught back up." Around September 2007, Olson talked to Sparks about "a guy out in Texas," Battah, who was interested in providing additional financing to River City.[5] Olson told Sparks that Battah had offered to provide River City an additional $2,000,000 in credit in exchange for "$120,000 a year that would be paid [to Battah] as compensation." Olson knew Battah because River City had regularly purchased merchandise from one of Battah's companies. Sparks told Olson that he was against the proposal because he did not believe that Olson could generate enough profit off of the additional financing to justify the payment to Battah.[6]

_____

[5] At the time, Sparks did not know that Battah was the "guy out in Texas." Sparks learned of Battah's identity during discovery in this case.

[6] Sparks testified that he had the right to veto the proposal pursuant to a provision of the Consignment Agreement that stated as follows: "TBS hereby engages the services of [River City] for the purpose of buying and selling the consigned products. [River City] shall be authorized to use its discretion in determining the pricing, timing and terms of all such purchases and sales subject to existing criteria routinely used by the parties. *During the term hereof, the parties shall work exclusively with one another*." (Emphasis added).

¶10.    Later in September 2007, River City and one of Battah's companies, QQB, entered into an informal arrangement that was never reduced to a written contract. Under this arrangement, QQB paid River City $2,418.45 per month to lease a fenced-in area of River City's warehouse. QQB then purchased up to $1,000,000 in "top shelf" groceries to be stored in the fenced-in area. Battah and Olson clearly anticipated that River City would purchase most or all of the groceries that QQB purchased. However, the groceries remained QQB's property until they were sold to River City, and QQB remained free to sell to other customers. QQB did not extend credit to River City, and River City had to pay in advance to obtain product from QQB. Olson testified that he and Battah "collaborated" and discussed what types of merchandise QQB should purchase.[7]

¶11.    When River City had funds available, it would buy merchandise from QQB, which profited by selling the product to River City at a markup. However, Battah quickly realized that River City was not buying as much product as he had anticipated. Battah grew frustrated because QQB was not making money, and he "negotiated" with Olson for River City to pay certain expenses involved in his operation. QQB invoiced River City for expenses including interest, phone charges, an alarm system, and an accountant's salary.

¶12.    Within about two months, Battah realized that QQB's arrangement with River City was not going to be profitable because River City was not buying much product. Because River City's funds were limited, Olson requested that QQB sell River City individual

_____

[7] Battah testified that he personally financed the arrangement by investing $1,000,000 in QQB. Sparks testified that he visited the warehouse during this time period and was aware that Olson was leasing the fenced-in area to another entity, but he could not recall whether he knew that the lessee was QQB.

6

"pallets" of merchandise, which were about one-thirtieth of the "truckload" quantities Battah was accustomed to selling. Battah was uninterested in making such sales. As a result, in late November or early December 2007, QQB sold its remaining inventory to other parties and closed its business.

¶13. Throughout 2007, Sparks regularly questioned Olson about River City's financial condition, inventory, and accounts receivable. TBS's bank required River City to maintain a combined balance of inventory and accounts receivable (referred to as its "borrowing base") that exceeded TBS's total borrowing under the line of credit. Olson continually assured Sparks that River City was in good financial condition and had an adequate borrowing base. On September 26, 2007, Olson told Sparks that River City's sales and gross profits were "better than they[ had] been in over 2 years." On November 16, 2007, Olson represented to Sparks that as of the close of business on August 31, 2007, River City's accounts receivable totaled $1,402,707.69, and its inventory totaled $3,197,204.66. Olson provided supporting documentation for the inventory figure. Based on Olson's representations, the combined balance of these two accounts satisfied the bank's "borrowing base" requirement and provided adequate security for the debt. On November 26, 2007, RGIS, a third-party inventory specialist hired by TBS, conducted a physical inventory at River City's warehouse. RGIS calculated that the value of River City's inventory was $2,670,274.13.[8] On that date, River City represented to TBS that it had accounts receivable

---

[8] The trial court excluded the RGIS inventory as hearsay. On appeal, Silver Dollar argues that the trial court abused its discretion because the testimony of Sparks and Olson established that the inventory was admissible as a business record of TBS or River City. *See* MRE 803(6).

7

of $1,985,816.22. On December 26, 2007, Olson represented to Sparks that the combined balance of the inventory and accounts receivable was "still at 4.6 million."

¶14. However, on January 11, 2008, Olson informed Sparks that River City had only $505,615.84 in inventory and $553,545.23 in accounts receivable. On January 15, 2008, Olson stated he assumed there was "probably no hope for saving this business." Olson blamed Sparks for using his "financial resources to finance what would become [River City's] closest competitor in Titan Wholesale." Olson asked Sparks how he "want[ed] to proceed with the inventory liquidation process." Sparks testified that Olson then ceased communicating with him and never explained how the combined value of River City's accounts receivable and inventory could have decreased by more than $3,500,000 in a span of just sixteen days. River City subsequently sent a notice of corporate dissolution to its creditors, not including TBS.

¶15. TBS could not pay its debt under its line of credit and was forced to convert the line of credit into a term loan in the amount of $4,046,768.20. At trial in April 2022, Sparks testified that he had been making payments on the loan of $30,000 per month for nearly fourteen years. River City never repaid the promissory notes it had executed as part of the 2001 settlement agreement. *See supra* ¶6. When River City dissolved in 2008, it owed approximately $620,000 and $512,000, respectively, on the two notes. River City also owed Silver Dollar approximately $1,200,000 for inventory purchases.

¶16. In February 2008, as he was still in the process of dissolving River City, Olson went to work for SPFM LP, a company owned by Battah and Battah's brother. Olson was hired

at an annual salary of approximately $250,000 and still worked for SPFM at the time of the trial in April 2022. SPFM is also in the wholesale grocery business.

¶17. In 2010, TBS assigned its claims against River City and Olson to Silver Dollar. Silver Dollar then filed a complaint in the DeSoto County Circuit Court against Olson and "John Does 1 through 10," who were identified as individuals or entities who had maliciously interfered with TBS's business relationship with River City and Olson. The complaint alleged that Olson was personally liable as the "alter ego" of River City.

¶18. In 2016, Silver Dollar filed a third amended complaint that substituted Battah for John Doe 1. Silver Dollar asserted claims against Olson for breach of contract, breach of the two promissory notes discussed above, and fraud. Silver Dollar asserted claims against Battah for tortious interference with contract and business relations. Silver Dollar asserted claims against Olson and Battah for fraudulent transfer, conversion, and conspiracy. The case eventually proceeded to a jury trial in April 2022.

¶19. Silver Dollar called four witnesses during its case-in-chief: Sparks,[9] Olson, Battah, and a damages expert. At the close of Silver Dollar's case-in-chief, the circuit court granted Battah's motion for a directed verdict, finding as a matter of law that there was insufficient evidence for the jury to return a verdict against Battah.

¶20. Olson rested his case without calling any witnesses. The jury returned a verdict in

_____

[9] In his testimony at trial, Sparks acknowledged that in 2018 he pled guilty in federal court to one count of conspiracy to transport property taken by fraud in interstate commerce. Sparks admitted that he pled guilty to being part of a conspiracy in which he represented to food manufacturers that he would deliver their unsaleable products to a facility for destruction but instead diverted those products for sale in grocery stores.

favor of Silver Dollar and against Olson, finding that Olson had committed fraud. The jury found that Silver Dollar was entitled to recover damages of $6,618,461.71. In addition, following a separate hearing, the jury found that Olson should pay punitive damages of $250,000. The circuit court subsequently entered a final judgment on the jury verdict in favor of Silver Dollar and against Olson and entered a final judgment dismissing all claims against Battah with prejudice. Silver Dollar filed a notice of appeal from the final judgment in favor of Battah.[10]

¶21. On appeal, Silver Dollar argues the trial court erred (1) by granting Battah's motion for a directed verdict on Silver Dollar's claim for tortious interference with business relations,[11] (2) by excluding the RGIS inventory as hearsay (*see supra* ¶13 & note 8), and (3) by "failing to control the courtroom."[12] For the reasons discussed below, we hold that the trial court did not err by granting Battah's motion for a directed verdict. We do not address Silver Dollar's second and third issues on appeal because they do not affect our resolution of the first issue, which is dispositive.[13]

---

[10] Olson did not file any post-trial motions or appeal and is not a party to this appeal.

[11] On appeal, Silver Dollar only addresses its claim for tortious interference with business relations.

[12] Silver Dollar alleges that counsel for Battah asserted "repeated baseless objections" during trial and that the trial court "fail[ed] to control" counsel or "adequately resolve these issues," which disrupted Silver Dollar's ability to present its case.

[13] *See Life & Cas. Co. of Tenn. v. Nix*, 172 Miss. 91, 158 So. 797, 798 (1935) (stating that it was "unnecessary . . . to consider the appellant's objection to the various rulings of the court below on the introduction and exclusion of the evidence" because "the appellee on the uncontradicted evidence was entitled to a directed verdict").

**ANALYSIS**

¶22. We review the trial court's grant of a directed verdict de novo. *Rogers v. Est. of Pavlou*, 326 So. 3d 994, 997 (¶12) (Miss. 2021). A defendant's motion for a directed verdict tests the legal sufficiency of the plaintiff's evidence. *Id.* If the plaintiff's evidence and any reasonable inferences that may be drawn from it are sufficient for reasonable jurors to find for the plaintiff, then the defendant's motion should be denied. *Id.* at 998 (¶12). "However, the [Supreme] Court has held that a trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." *Id.* (quotation marks omitted). Therefore, if the evidence, when viewed in the light most favorable to the plaintiff, points so overwhelmingly in favor of the defendant that reasonable jurors could not have returned a verdict for the plaintiff, we must affirm the trial court's ruling. *Id.* at (¶13) (quoting *Forbes v. Gen. Motors Corp.*, 935 So. 2d 869, 873 (¶4) (Miss. 2006)). "Conversely, if . . . there is substantial evidence of such quality and weight that reasonable, fair-minded and impartial jurors could have differed on the matter, . . . then we must reverse and remand." *Id.*

¶23. Silver Dollar argues that the trial court erred by granting Battah's motion for a directed verdict because there was sufficient evidence for reasonable jurors to find for Silver Dollar on its claim of tortious interference with business relations. The Mississippi Supreme Court has held that a claim of tortious interference with a business relationship has four essential elements. *MBF Corp. v. Century Bus. Commc'ns Inc.*, 663 So. 2d 595, 598 (Miss. 1995). The plaintiff must prove that "(1) [t]he [defendant's] acts were intentional and

11

willful; (2) [t]he acts were calculated to cause damage to the plaintiffs in their lawful business; (3) [t]he acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); [and] (4) [a]ctual damage and loss resulted." *Id.* "The general rule in this state is that there is no tortious interference when one has a justifiable interest and reason for acting." *Vestal v. Oden*, 500 So. 2d 954, 957 (Miss. 1986). Therefore, a defendant's "effort to increase [its own] profitability, without more[,] is not improper." *McBride Consulting Serv. LLC v. Waste Mgmt. of Miss. Inc.*, 949 So. 2d 52, 57 (¶16) (Miss. Ct. App. 2006). Such conduct is not actionable even if the defendant's conduct was "very aggressive in the pursuit of business, and may even be described as playing hardball." *Id.* at (¶17). Moreover, the plaintiff must prove that the defendant's conduct caused the plaintiff *actual* damages, i.e., damages that are "substantial, rather than nominal." *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 17 (¶37) (Miss. 2007). The Mississippi Supreme Court has "clearly h[eld] that damages must be shown by something more than mere speculation." *Sports Page Inc. v. Punzo*, 900 So. 2d 1193, 1200 (¶22) (Miss. Ct. App. 2004).

¶24. In the present case, Silver Dollar argues that "Battah engaged in a course of conduct designed to siphon as much money from River City as possible despite knowing about the business arrangement between . . . River City[] and . . . TBS." Silver Dollar argues that there was proof from which reasonable jurors could have found that Battah knew that TBS was financing River City's inventory and operations.[14] Silver Dollar further argues that

---

[14] At trial, Battah denied that he knew about River City's relationship with TBS. Silver Dollar attempted to impeach Battah with his ambiguous answer to a similar question

12

Battah—through his company QQB—tortiously interfered with the relationship between TBS and River City by charging River City a "marked-up price" on sales it made to River City and by insisting that River City reimburse QQB for various expenses. Silver Dollar argues that River City's payments to QQB "effectively siphoned money that could and should have gone to TBS."

¶25. However, even when viewed in the light most favorable to Silver Dollar, the evidence fails to establish any acts by Battah that were intentional and willful, calculated to cause damage to TBS, and malicious, i.e., "done with the unlawful purpose of causing damage and loss, without right or justifiable cause." *MBF Corp.*, 663 So. 2d at 598. Rather, the evidence showed that Battah entered into an informal arrangement with River City under which QQB leased space in River City's warehouse, purchased inventory from third parties, and then resold some of that inventory to River City. The evidence does show that Battah became displeased because River City was not purchasing as much product from QQB as the parties had expected. As a result, Battah demanded that River City reimburse QQB for various expenses such as interest, the cost of an alarm system to protect QQB's inventory, and part of an employee's salary. But as this Court explained, a defendant's "effort to increase [its own] profitability, without more[,] is not improper."[15] *McBride Consulting Serv.*, 949 So. 2d at 57 (¶16). Battah's business tactics may have been "aggressive, and may even be described as playing hardball." *Id.* at (¶17). But without more, Battah did not commit a tort

during his deposition.

[15] Battah testified that QQB was a money-losing venture, and there is no evidence to the contrary. Thus, Battah was only seeking to cut his losses, not increase his profits.

13

by looking out for and aggressively pursuing his own business interests.

¶26.    Silver Dollar also argues that a reasonable jury could have concluded that Battah was, in some unspecified way, "involved in the disappearance of . . . inventory" owned by TBS. However, Silver Dollar identifies no evidence that Battah played any role in any missing inventory.  Indeed, there is no evidence in the record to support this allegation.  Although we view the evidence in the light most favorable to Silver Dollar, "speculation and conjecture alone will not support a verdict." *Double Quick Inc. v. Lymas*, 50 So. 3d 292, 299 (¶35) (Miss. 2010) (reversing the denial of a motion for judgment notwithstanding the verdict). Here, because there was no *evidence* that Battah converted or conspired to convert TBS's property, the trial court properly granted Battah's motion for a directed verdict.  As stated above, "a trial court should submit an issue to the jury only if the *evidence* creates a question of fact concerning which reasonable jurors could disagree." *Rogers*, 326 So. 3d at 998 (¶12) (emphasis added).

¶27.    Finally, the trial court did not err by granting Battah's motion for a directed verdict because there was no evidence that any conduct by Battah proximately caused actual damages to TBS. *MBF Corp.*, 663 So. 2d at 598.  As stated above, in a tortious interference case, the plaintiff must prove that the defendant's conduct caused actual damages, i.e., damages that are "substantial, rather than nominal." *Biglane*, 949 So. 2d at 17 (¶37).  Silver Dollar's damages expert presented two alternative damages models.  The first model was premised on debt that Silver Dollar incurred as a result of River City's closure.  The second model was premised on debts that River City owed to Silver Dollar and TBS.  Essentially,

both damages models showed that Silver Dollar suffered damages because River City became insolvent and then failed. The expert's testimony certainly supported an award of damages against Olson. However, the evidence fails to show that River City became insolvent or failed because of its limited dealings with Battah during a two- or three-month period in late 2007. This provides an additional reason for us to affirm the circuit court's grant of a directed verdict and the final judgment in favor of Battah.

## CONCLUSION

¶28. The trial court did not err by granting Battah's motion for a directed verdict because Silver Dollar failed to present sufficient evidence to prove essential elements of its claim for tortious interference with business relations.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.**

**McDONALD, J., DISSENTING:**

¶30. I respectfully dissent from the majority's holding affirming the trial court's grant of a directed verdict on Silver Dollar's claim against Battah of tortious interference with a business relationship. I would find that a reasonable interpretation of the evidence supported an inference of tortious interference; thus, Silver Dollar's claim should have survived Battah's motion for a directed verdict.

### Additional Relevant Facts

¶31. Sparks, Olson, and Battah were all involved in the grocery business. Sparks and

15

Olson testified that they knew each other and had done business in some capacity throughout the 1990s and early 2000s. Sparks, through his company TBS, provided financing to Olson's company, River City. Olson used this financing to buy groceries and then sell them for a profit. Sparks also owned Silver Dollar, from which River City purchased roughly twenty percent of its groceries. Both Silver Dollar and TBS also purchased products from Battah, who was based out of Texas.

¶32. In 2001, River City filed for bankruptcy. TBS, being the primary creditor for River City, entered into a settlement agreement with River City that now is referred to as the "Sales and Consignment Agreement." This agreement required TBS to provide a four-million-dollar line of credit to River City for River City to stay in business and, in turn, pay off its old debt to TBS. River City was required to sell all products on a consignment basis for TBS, as reflected in the consignment clause:

> During the term hereof, RCT shall acquire for TBS certain food, drug product and general merchandise (herein "products"), including those items currently located in RCT's warehouse together with any additional products in such quantity and nature as RCT may acquire on behalf of TBS, to the extent of the funding commitment as described in Section 5 hereof, for RCT to sell on a consignment basis for TBS. . . . The consigned products shall remain TBS's property until sold to RCT's customers, and title to the proceeds of the sales of such products shall vest in and belong to TBS until accounted for and remitted to TBS. . . . If requested in writing by TBS, to the extent practicable, *RCT will ensure that all purchases and sales are made in the name of TBS in order to reflect the intent of the parties that RCT is purchasing and selling goods for TBS and that TBS is the owner of such goods*.

(Emphasis added). This agreement also contained an exclusivity clause, which read:

> TBS hereby engages the services of RCT for the purpose of buying and selling the consigned products. RCT shall be authorized to use its discretion in determining the pricing, timing, and terms of all such purchases and sales

16

subject to existing criteria routinely used by the parties. *During the term hereof, the parties shall work exclusively with one another.*

(Emphasis added). In other words, River City agreed that it would exclusively rely on TBS for financing.

¶33. In September 2007, based on emails between Olson and Sparks, River City was facing a dilemma. Sparks had informed Olson that the bank through which TBS had secured the four-million-dollar line of credit was going to require him to reduce the line of credit or else it would have to reclassify the loan (which would result in a higher interest rate). Olson and Battah discussed the matter, and Battah offered Olson a two-million-dollar loan. Olson asked Sparks if he could accept this offer, but Sparks refused, stating that he was worried River City would not be able to pay both Battah and TBS. Olson informed Battah that he could not accept that offer, but there appears to have been a counteroffer made, which Battah refused. Olson finished the email conversation between himself and Sparks with the statement, "[W]ith what you're telling me about [the bank], I think we need to strongly consider some type of additional financing. I don't know who or where it would come from but if [the bank] is going to make us reduce your line by a large amount, I'm not sure how we'll continue to survive." As far as Sparks was aware, that appeared to be the end of the matter.

¶34. However, this was not the end of Battah and Olson's dealings. In late 2007, Olson and Battah went on to engage in behavior that appears to have been done for the sole purpose of circumventing the exclusivity clause of the sales and consignment agreement, effectively cutting Sparks out. In late September, River City rented a portion of its warehouse to QQB

17

Factors, a new company that Battah created specifically to do business with River City. QQB erected a fence in the warehouse, cordoning off its products from River City's products. QQB would then purchase products on behalf of River City, at the direction of Olson, and store those products in the QQB space. Olson and Battah testified that there was up to one million dollars worth of product stored in the QQB space at any given time. River City was then allowed to purchase that product directly from QQB, and then immediately sell it to third-party buyers. In exchange, QQB charged River City the cost of the product, plus a "mark-up" for the convenience of having the product readily available. River City also paid interest to QQB based on the fact that River City was not purchasing enough of the products. In other words, River City paid interest, as evidenced by checks in the record, to QQB to maintain its access to the one million dollars of inventory, which is in essence a "product" line of credit, as opposed to TBS's monetary line of credit.

¶35. The majority seems to characterize this arrangement as being all above-board, with Battah acting as a regular vendor to River City but with the added convenience of proximity of their goods to River City's warehouse. The majority describes Battah's practices as "playing hardball" by renegotiating with River City when it was not making use of the loaned products as much as originally anticipated. However, I believe that a reasonable interpretation of the evidence could support the opposite conclusion. Battah was not a mere vendor to River City. Rather, Battah was acting as a creditor to River City, investing one million dollars worth of product and charging River City "mark-ups" for the use of that product and interest for the continued storage of the product. When River City was not

18

selling Battah's product, as apparently agreed, Battah did not sell to anyone else but, instead, required River City to reimburse Battah. Although the products were technically owned by QQB until River City had found a buyer, this is no different from how TBS technically owned all of River City's products until River City had sold them to a buyer. In effect, Battah had created an unwritten sales and consignment agreement between himself and Olson without Sparks's approval. All the deals were done by word of mouth, checks, or wire transfers, but no written contract was ever drafted, which enabled River City and Battah to spin the facts as they wanted at trial. It should be noted that despite Battah's knowledge of Olson's business failures, Olson went to work for Battah and was paid a $250,000 annual salary.

**Discussion**

¶36. "When the defendant moves for a directed verdict at the close of the plaintiff's case-in-chief, the circuit court must consider the evidence before it at that time in the light most favorable to the plaintiff, giving the plaintiff the benefit of all favorable inferences that may reasonably be drawn from that evidence." *City of Jackson v. Johnson*, 343 So. 3d 356, 371 (¶35) (Miss. 2022) (quoting *Upton v. Magnolia Elec. Power Ass'n*, 511 So. 2d 939, 942-43 (Miss. 1987)). "[I]f by any reasonable interpretation, it can *support an inference of tortious interference* which the non-moving party seeks to prove, the motion must be denied." (Emphasis added). *MBF Corp. v. Century Bus. Commc'ns Inc.*, 663 So. 2d 595, 598 (Miss. 1995). "Circumstantial evidence is 'evidence which, without going directly to prove the existence of a fact, gives rise to a logical *inference* that such fact does exist.'"

19

(Emphasis added). *Carpenter v. State*, 311 So. 3d 1268, 1275 (¶26) (Miss. Ct. App. 2021) (quoting *Shelton v. State*, 214 So. 3d 250, 258 (¶40) (Miss. 2017)). Based on this law, an inference is something that can be proved through circumstantial evidence alone.

¶37. Four elements are necessary to prove a claim of tortious interference with a business relationship. *AmSouth Bank v. Gupta*, 838 So. 2d 205, 214 (¶24) (Miss. 2002). The plaintiff must prove "(1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant, which constitutes malice; and (4) actual damage and loss resulted." *Id*. Silver Dollar presented evidence of all of these elements, which created a fact issue for the jury.

¶38. In *AmSouth*, the Supreme Court established that "the requisite intent is inferred when [a] defendant knows of the existence of a [business relationship[16]] and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract." *AmSouth*, 838 So. 2d at 214 (¶25) (quoting *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986)). In other words, the language of *AmSouth* reflects that the plaintiff does not need to show specific details, but must show knowledge of a business relationship and that his acts would likely interfere with that relationship. At trial, while Battah testified that he did not know TBS was a financial backer to River City,

---

[16] While *Liston* dealt with a claim of tortious interference with contract, the Supreme Court in *AmSouth* ultimately found that because the actions of tortious interference with contract and tortious interference with business relations have identical elements, the *Liston* test for inferring intent can be applied to claims of tortious interference with business relations.

the emails between Olson and Sparks reflect that when Battah offered the two million dollars in financing to Olson, Olson had to confer with another party before accepting or rejecting the offer. A reasonable interpretation of this evidence supports an inference that Battah knew that Olson was in a business relationship with some other entity because he was unable to accept the offer on his own. The identity of this entity was irrelevant; it only matters that the relationship existed.

¶39. To establish the element that Battah's actions were calculated to cause damage, a party does not have to prove that the *sole* motive of the defendant was to cause damage to the plaintiff, but it is enough to show that it was aware that in carrying out its acts, harm would likely befall the plaintiff. *MBF Corp.*, 663 So. 2d at 599.

¶40. In *MBF Corp.*, the plaintiffs showed that the defendant, Century, had taken files from the premises of MBF, hired its two key salesmen, and instructed those salesmen to poach customers from MBF using customer files that were proprietary to MBF. *Id*. The Supreme Court found this was enough to show that the acts were calculated to cause damage to MBF, because Century was aware that it was causing damage to MBF's customer base, and thus its entire business. *Id*. While Battah's actions may not rise to the level of corporate espionage that occurred in *MBF Corp.*, I would find that a reasonable interpretation of his acts supports an inference that Battah knew River City had financial backing from another source. Thus, Battah would also have known that in circumventing the financial backer, he was likely doing harm to the business relationship between TBS and River City. It is not necessary to show that Battah knew the intricacies of the Sales and Consignment Agreement

21

to prove that he knew his interference may cause actual harm to TBS. Rather, showing that he acted in a way to circumvent it supports an inference that he was aware that his actions may bring harm to TBS.

¶41. The third element of tortious interference is proving that the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice). *AmSouth*, 838 So. 2d at 214 (¶24). An actual crime does not have to be committed; rather, a plaintiff can succeed on this element by proving "defamation, disparagement, intimidation or harassment of the plaintiff's customers or employees, obstruction of the means of access to his place of business, threats of groundless suits, *commercial bribery* and inducing employees to commit sabotage." *Cenac v. Murry*, 609 So. 2d 1257, 1270-71 (Miss. 1992) (emphasis added).[17] In this case, a reasonable interpretation of the facts supports an inference that Olson, a twice-failed businessman being offered a job at Battah's company making the hefty salary of a quarter-million dollars a year just a few weeks after the collapse of River City, amounted to

---

[17] Mississippi Code Annotated section 97-9-10 (Rev. 2020) identifies commercial bribery as a crime, stating:

> (1) Commercial bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee or fiduciary, without the knowledge and consent of the principal or employer, with the intent to influence such agent's, employee's or fiduciary's action in relation to the principal's or employer's affairs.

While Silver Dollar did not argue that Battah was engaged in commercial bribery directly to the court below, it appears, based on the evidence TBS presented, that commercial bribery may have occurred either in the form of the one-million-dollar loan of products or in the $250,000 yearly salary Battah offered to Olson after River City collapsed.

commercial bribery and, thus, constituted malice.

¶42. The last element of tortious interference with a business relationship is damages. In this case, TBS and River City had operated a successful venture from 2001 to 2007. However, as soon as River City began doing business with Battah, within just a few months, River City collapsed. This collapse left TBS owing the full balance of the four-million-dollar line of credit River City used, as well as being unable to collect the remaining debt that River City owed from its 2001 bankruptcy. While Battah may argue that the collapse of River City was inevitable, due to other financial constraints at play, it is ultimately the role of the jury to weigh the likelihood of whether River City could have survived but for Battah's involvement, causing damage to TBS.

¶43. While the majority views the fact that Battah was only involved with River City for "a two- or three-month period in late 2007" (thus no evidence that his interaction with the business caused its failure), a reasonable jury could draw the opposite conclusion from the facts. The fact that River City only collapsed *after* Battah became involved supports the inference that his interference did, in fact, cause the collapse of River City. Indeed, just as TBS feared, the involvement of an outside investor caused River City to become insolvent and collapse, leaving TBS holding the bag for the outstanding debts that River City had accumulated. The fact that Battah then almost immediately hired Olson for an annual salary of nearly a quarter-million dollars further supports the inference that there was some quid pro quo between the two.

¶44. Based on these additional facts, I would find that in crafting and participating in this

23

arrangement, Battah interfered with the exclusivity clause of TBS and River City's sales and consignment agreement.

**Conclusion**

¶45. While Silver Dollar did not produce a smoking gun that showed Battah and Olson conspired to defraud TBS, River City and Battah orchestrated their arrangement to avoid TBS or anyone else from finding a smoking gun. It is not unusual for conspiring parties to cover their tracks and deliberately avoid creating documents that would record their true motives or plans. It is almost incredible that a million-dollar deal would have no written memorialization. Silver Dollar did, however, present evidence that supported the inference that (1) Battah knew of the business relationship; (2) Battah was substantially certain that interference with the business relationship would likely cause harm; (3) Battah did not have a justifiable cause for interfering with the business; and (4) Silver Dollar did suffer actual damage. Based on the above, I would find that sufficient evidence was presented on each element upon which a reasonable jury could have inferred tortious interference. I would thus hold that the trial court erred in granting the motion for a directed verdict as to Silver Dollar's claim against Battah of tortious interference with a business relationship, and I would reverse and remand for a new trial. For this reason, I dissent.

**WESTBROOKS, J., JOINS THIS OPINION.**

24